**UNITED STATES of America, et al., Plaintiffs,**

**v.**

**State of WASHINGTON, et al., Defendants.**

**Cause No. 9213.**

See appellate decisions, 234 F.3d 1099, 235 F.3d 429, 235 F.3d 438, 235 F.3d 443.

TABLE OF CONTENTS

*ORDER* *PAGE*

Stipulation and Order Concerning Co–Management and Mass Marking (4/28/97) 1256

Order Granting Swinomish Motion for Temporary Restraining Order (6/16/97) 1266

Order Granting Swinomish Tribe's Motion for Preliminary Injunction (7/30/97) 1267

Stipulation Regarding S'Klallam Tribes' Usual and Accustomed Fishing Places
(2/10/98) 1270

Order regarding Cross–Motions for Preliminary Injunction (6/12/98) 1270

Order Granting Respondent's Motion to Dismiss in Part, Granting Petitioners'
Motion to Strike in Part and Scheduling Pretrial Conference (8/5/98) 1272

Order Denying Lummi's Motion to Dismiss and for Summary Judgment and
Granting the Four Tribes' Motion to Dismiss (9/2/98) 1277

Stipulated Settlement Agreement of the Swinomish Indian Tribal Community and
the Upper Skagit Indian Tribe (10/21/98) 1280

Order Denying State of Washington's Motion for Summary Judgment and Granting
Quinault Nation's Cross–Motion for Summary Judgment (12/3/98) 1294

Stipulation of the Upper Skagit Tribe and the Tulalip Tribes Concerning Upper
Skagit Tribe's Usual and Accustomed Fishing Places (1/23/99) 1297

Order Approving Stipulated Settlement Between Lummi Nation and Upper Skagit
Indian Tribe (2/16/99) 1300

Order Approving Stipulated Settlement Between Swinomish and Upper Skagit
Indian Tribe (2/16/99) 1303

Order Approving Stipulation of the Upper Skagit Tribe and the Tulalip Tribes Concerning Upper Skagit Tribe's Usual and Accustomed Fishing Places (2/16/99) 1304

Order Granting Petitioner's Motion for Summary Judgment, Denying Respondent's Motion for Summary Judgment and Dismissing Subproceeding (9/10/99) 1304

Order Altering and Amending Judgment (10/18/99) 1312

Minute Entry: In Chambers Proceedings (10/21/99) 1312

Order Granting Muckleshoot Tribe's Motion for Summary Judgment (11/4/99) 1312

Order Granting Motion to Alter or Amend Judgment (12/9/99) 1315

Order Clarifying Implementation Order re Tribal Access Across Private Upland Property (12/11/99) 1315

COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS
(Through December 31, 1999)
STIPULATION AND ORDER CONCERNING CO–MANAGEMENT AND MASS MARKING

Subproceeding No. 96–3.

(April 28, 1997)

BARBARA JACOBS ROTHSTEIN, District Judge.

1. Stipulation.

1.1. The purpose of this Stipulation is to reaffirm and help clarify established principles and guidelines affecting management of fisheries resources subject to the authorities and obligations of the various Washington treaty tribes and, on behalf of the State of Washington, the Washington Department of Fish and Wildlife ("WDF & W"). This Stipulation does not precisely define nor does it create, expand, or diminish any party's[1] legal rights or jurisdictions, provided, however, that procedural rights are created by paragraphs 1.7, 1.8, and 1.9.

1.2 The WDF & W and each of the signatory Washington treaty tribes have independent and differing authorities, mandates and responsibilities for developing and implementing management programs to protect, enhance, and utilize fish and wildlife resources in a sustainable manner within their respective jurisdictions.

1.3 The WDF & W has certain responsibilities for managing fish and wildlife resources and non-treaty fisheries within the boundaries of the state and adjacent to the Washington coast. This jurisdiction and responsibility must be exercised in conformity with the state's obligations to comply with treaty Indian fishing rights reserved by the tribes by federal treaty and/or defined by federal court decisions and orders. The treaty tribes have certain responsibilities for managing fish and wildlife resources and treaty fisheries within their reservations and certain fisheries resources and treaty fisheries within and/or passing through their respective usual and accustomed areas. This jurisdiction and responsibility also must be exercised in conformity with rights reserved by federal treaty, as interpreted by federal court decisions and orders.

1.4 The overlapping nature of their respective jurisdictions and authorities cre-

---

[1] "Party," as used in this stipulation, means only the signatories to this stipulation, not all parties to *United States v. Washington.*

ates a co-management relationship between the state and the treaty tribes in the sense that: WDF & W and the respective tribes have certain authorities that potentially pertain to the same fisheries resource, there is a need for all parties to cooperate in the discharge of their respective authorities, certain federal court orders prescribe cooperative and coordinated fishery management actions and activities, and generally, the application of state law to treaty fisheries is preempted unless such application is in compliance with applicable federal court orders. Various state/tribal plans and intertribal plans and numerous federal court orders prescribe how the WDF & W and the tribes are to exercise their respective authorities. These plans and court orders reflect the fact that actions taken by one party often can affect other parties, and that the multi-jurisdictional nature of management can lead to conflicts between the parties.

1.5 To minimize such conflicts, and to promote effective and efficient management of those fish and wildlife resources that are subject to both state and tribal management, the WDF & W and tribes have developed a cooperative management approach to the exercise of their respective authorities. The approach was developed and must be maintained based on the principles of government-to-government relationships. Its successful implementation depends upon joint planning, regular consultation, explicit objectives, and agreed data to foster consistent and coordinated management programs, while respecting the legitimate decision-making authorities of each party.

1.6 WDF & W and the treaty tribes shall continue to refine this cooperative approach to further increase efficiencies, improve resource management, reduce conflict between objectives, and avoid the need to resort to judicial or other third party dispute resolution mechanisms. It is expected that the cooperative approach will continue to resolve the majority of issues. Because the WDF & W and the treaty tribes have legitimate prerogatives in the exercise of their authorities and conduct of their fisheries, disputes between competing or co-existing objectives or conflicting interpretations of applicable law sometimes may arise.

1.7 Before taking any fisheries management action which would reasonably be expected to affect another party's fisheries any party shall give reasonable written notice of the action to each affected party. Notice shall be considered reasonable if it provides adequate time under the existing circumstances for any affected party to notify the proponent that the particular issue is disputed, and allow time for a request for dispute resolution as provided in this document, as well as application to the court for relief as contemplated by the provisions of the court's August 23, 1993 Order Modifying Paragraph 25 of Permanent Injunction.

1.8 The WDF & W and tribes shall, prior to taking any disputed action affecting another party, attempt a voluntary resolution of any dispute which the routine cooperative planning process described above fails to anticipate or adequately resolve. They shall refer the dispute to policy representatives designated by the affected tribes and the WDF & W. Any party may request a policy meeting on an issue in dispute upon timely, reasonable and written notice of the existence of the dispute to all affected parties. Utilizing support staff as they may desire, they will attempt promptly to resolve the dispute, utilizing a government-to-government approach.

1.9 No party shall take any action regarding the management of its fisheries which would reasonably be expected to

affect another party's management of its fisheries without agreement of that party or without first following the dispute resolution procedures contained in paragraphs 1.7 and 1.8 of this Stipulation, Provided, however, that harvest management regulatory actions or intertribal agreements already subject to existing court orders shall comply with those orders, rather than this paragraph.

1.10 In the event that the WDF & W and treaty tribes are unable voluntarily to resolve a dispute in accordance with paragraph 1.8, a party may resort to judicial review and resolution, pursuant to rules and procedures previously established by the federal court.

1.11 To foster the continued vitality and refinement of this cooperative management approach, the Director of the WDF & W and tribal representatives will conduct an annual meeting to be held no later than May 15 of each year, unless otherwise agreed by all parties. The agenda for discussion shall include, but not necessarily be limited to, the following:

1.11.1 Evaluating the effectiveness of the previous year's harvest management plans and practices in meeting established management objectives;

1.11.2 Considering new and/or reviewing ongoing management processes, planning activities, policies, and practices;

1.11.3 Review the previous year's habitat, enhancement, enforcement, and other fisheries management programs;

1.11.4 Establishing priorities and action plans for management activities for the coming year;

1.11.5 Identifying any disagreements to be resolved by policy and/or technical subgroups;

1.11.6 Identifying ways to improve the cooperative working relationship in the coming year; and

1.11.7 Other issues, as jointly agreed.

1.12 In dealing with federal and international fisheries management entities, including, but not limited to the Pacific Salmon Commission or its successor-in-interest, the parties shall be guided by this document and the co-management principles enunciated herein, and shall cooperatively develop regulatory or management actions which are consistent with federal court orders in *U.S. v. Washington* and *Hoh v. Baldrige.*

1.13 The parries hereby agree to the Coho Mass Marking and Selective Fisheries Implementation Plan ("Implementation Plan"), attached hereto as Exhibit A and incorporated herein by reference.

1.14 The undersigned parties agree to jointly request that the court adopt this Stipulation and Implementation Plan as an order of the court.

ORDER

1. The court has jurisdiction over the subject matter of this subproceeding.

2. The court has examined the foregoing Stipulation and the attached "Coho Mass Marking and Selective Fisheries Implementation Plan." The court finds that the Stipulation and Implementation Plan represent a fair and equitable settlement of the disputes in this subproceeding.

■ 3. The Stipulation and "Coho Mass Marking and Selective Fisheries Implementation Plan" are hereby adopted as a court order and incorporated herein. This Order is binding on the signatories to the Stipulation and shall be enforceable by them in the same manner and same respect as any other district court order in this case. In the event that the continuing jurisdiction of the court in *United States v.*

*Washington* shall be terminated, then the court retains such jurisdiction as is necessary to enforce the terms of this Agreement.

4. This order binds all parties which signed the Stipulation, including the State of Washington. However, the provisions concerning the notice and dispute resolution of actions reasonably expected to affect fisheries, shall, at this time, apply only to the Washington Department of Fish & Wildlife or its successor-in-interest, and any other state agency which may in the future be assigned any of the current functions of the Department, whether by legislative, judicial or executive action, and to other state agencies carrying out fisheries management functions pertaining to fin fish. This order is not intended to affect the claims of the treaty tribes that all departments of Washington state government should be bound by similar provisions. This order is without prejudice to those claims or positions being raised or advocated in the future.

5. This is a final order in this subproceeding. The agreed preliminary injunction, and the Order Modifying Temporary Restraining Order and Establishing Schedule dated December 24, 1996, are hereby dissolved and replaced by this order. This subproceeding is deemed complete.

IMPLEMENTATION PLAN:

Coho Mass Marking and Selective Fisheries

April 23, 1997

I. **General provisions.**

A. Purpose and intent. The purpose of this plan is to establish require-ments for implementing programs for the mass marking by removal of the adipose fin of hatchery coho, originating from Grays Harbor and northward, including Puget Sound, and for implementing fisheries that would selectively harvest marked fish in a manner that would affect management of fisheries resources subject to the authority and obligations of treaty tribes party to this plan.[1] The mass marking of coho salmon intended for release from tribal facilities may only proceed upon agreement between the pertinent state, tribal and/or federal parties involved. It is the intent of the parties to this plan to insure that mass marking and any selective fisheries for coho are implemented in a manner that facilitates conservation of the coho resource, benefits both treaty and non-treaty fisheries, and maintains a viable coastwide coded-wire tag (CWT) program. The parties intend to achieve the expected benefits of this new management strategy in a manner that is consistent with maintaining their ability to properly manage the coho resource and with meeting other legal obligations of the parties. This plan replaces a mass marking and selective fisheries Memorandum of Understanding, signed by some of the parties to this plan, dated May 3, 1996.

B. Parties. The parties to this plan are the Washington Department of Fish and Wildlife (WDFW), the Puget Sound and Washington coast-

---

1. Throughout this plan, the term "selective fisheries" means fisheries in which captured fish with a mass mark are differentially retained over unmarked fish, and the term "mass marking" means removal of the adipose fin; any other mass mark would require further discussion among the parties and possible modifications to this plan.

al treaty Indian tribes who signed the April 1997 stipulation to which this plan is appended (tribes), the National Marine Fisheries Service (NMFS) and the U.S. Fish and Wildlife Service (USFWS).

C. Plan amendments. The parties commit to modifying this plan as necessary, by agreement, in response to information gained from ongoing evaluations.

D. Plan duration. This plan will be reviewed by the parties no later than November, 2002. As part of this review, the parties will reach agreement on whether it should be continued, modified, or terminated.

E. Dispute Resolution. The parties commit to good faith technical- and policy-level efforts, as described in the "Stipulation and Order Concerning Co-management and Mass Marking" approved by the court on or about April 30, 1997, to attempt to resolve in a timely manner any disputes that may arise in connection with this plan, prior to initiating legal actions arising from such disputes. The parties may also explore and employ other jointly agreed dispute resolution approaches.

F. NMFS and USFWS Participation. NMFS and USFWS will participate in good faith in the processes described in Section III paragraphs A through E, however, the processes described are primarily state and tribal processes. NMFS fishery management authority in the EEZ stems from the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801 et seq. and other federal laws, and NMFS and USFWS are not parties to this agreement for the purpose of these paragraphs. Implementation and ongoing adherence to this plan by NMFS and USFWS shall be subject to the availability of appropriated funds.

## II. Mass Marking

A. Mass marking plans must be finalized annually by April 1 for coho which, due to fish culture considerations, must be tagged and/or marked in the spring, and by October 1 for those that can be tagged and/or marked in the autumn. Each party will provide its plans for mass marking to the other parties by February 1 of each year, identifying which production will be mass marked, which stocks will be "double index" coded-wire tagged, and the schedule for marking and tagging. Because sufficient time must be allowed to accommodate resolution of any disagreements, the parties will schedule their efforts so as to reach agreement by March 1 and September 1 of each year for spring and autumn groups, respectively. If agreements have not been reached by those dates, the parties will initiate appropriate dispute resolution to be completed by April 1 and October 1, respectively. Any mass marking being disputed in accordance with these timelines will not occur until the dispute is resolved. Any proposed modifications of previously-agreed or established plans that affect which stocks would be mass marked or double index tagged, or the agreed proportions that would be mass marked, must be provided to the parties at least 30 days prior to the affected marking or tagging, and agreement reached (or disputes promptly resolved) to accommodate the proposed change.

B. Those 1996 brood year hatchery coho groups listed in the attached Table 1 will be mass marked during the spring and summer of 1997, provided, however, that any mass marking of Green River, Crisp Creek production for Soos Creek shall be determined by a memorandum of understanding (MOU) between the state, Muckleshoot and Suquamish Tribes.

C. The Pacific Salmon Treaty (PST) commits the United States and Canada to "maintain a coded-wire tagging and recapture program designed to provide statistically reliable data for stock assessments and fishery evaluations." Appropriate coordination with Canada is a critical element of maintaining the viability of the coastwide CWT program (a definition of a viable CWT program is provided in Paragraph 10.4 on pages 180–181 of the PSC's June, 1995 AdHoc Selective Fisheries Evaluation Committee (AHSFEC) report; this definition is subject to further refinement among the parties per Paragraph III.E.5, below). In January 1997, the Pacific Salmon Commission (PSC) agreed to establish procedures for exchanging, evaluating, and coordinating mass marking and selective fisheries proposals. It also agreed to establish a permanent bilateral Selective Fisheries Evaluation Committee (SFEC) to provide appropriate scientific advice to the PSC and the parties. The PSC has developed and adopted a specific work plan to identify and address technical feasibility issues to facilitate informed policy judgment on mass marking and selective fisheries. Accordingly, pursuant to their own needs and consistent with the PSC's January 1997 agreement and its SFEC's work plan, the parties to this plan will:

(1) cooperate and coordinate their efforts with the longer term process and schedule to be developed by the PSC;

(2) complete the following short-term technical tasks prior to the PSC's February, 1997 meeting:

(a) review and finalize technical reports of 1996 field studies regarding efficacy of electronic detection technologies;

(b) develop plans for evaluating 1995 and 1996 brood coho programs;

(c) initially define fishery sampling program logistics and costs; and,

(d) define plans for conducting additional field studies for 1997;

(3) develop, implement, and maintain agreed CWT sampling plans that provide for adequate sampling rates and, where necessary for CWT retrieval, electronic detection methods, to meet the intent of the commitment under the PST to maintain the viability of the coastwide CWT program, including providing for statistically reliable data for stock assessments and fishery evaluation.

D. WDFW will be responsible for reasonable increased costs incurred by the tribes required by this mass marking and selective fisheries plan. These envisioned costs specifically include providing for equipment use and maintenance, costs of marking and tagging operations, and increases in staff for CWT sampling, if any are required. This responsibility will be met by providing funds to the tribes directly, by securing new, outside funding sources, and/or by providing equipment and direct technical assistance. NMFS and USFWS will explore opportunities they may have to assist the parties in meeting these

obligations as well as other activities of this implementation plan. WDFWs obligations for costs incurred by a tribe (or tribes) will be reduced in the event the tribe(s) chooses to benefit from the mass marking program by conducting selective fisheries; the extent of the reduction in WDFW's obligations will be determined by the parties, taking into account the full range of benefits accruing to the affected parties due to selective fisheries.

E. When conducting mass marking, the parties will use hatchery culture, handling, and marking/tagging practices that will minimize mortalities caused by these activities.

### III. Selective Fisheries

A. The parties understand that selective fishery options will be evaluated on their individual merits in the context of the elements of this plan; they are not assured simply because mass marking has occurred. Selective fisheries will be implemented, if appropriate, according to the terms described below.

B. Selective coho fisheries, will be implemented only as part of agreed annual fishery management plans that address a broad range of coho fisheries. These annual plans, which include defining levels of impact on coho stocks of concern by all fisheries, will continue to be negotiated and agreed to through the so-called "North of Falcon" process unless otherwise agreed by the parties. These plans will not require use of selective fisheries by any tribe, unless otherwise agreed, in order to meet spawning escapement objectives, treaty/non-treaty allocation standards, and intertribal and other harvest sharing objectives of the parties. Selective fisheries will be implemented in a manner that meets treaty Indian fishing rights.

C. Proposals for selective fisheries will provide sufficient information to meet the needs described in Appendix C of the "Pacific Salmon Commission Selective Fishery Evaluation" report (June 9, 1995).

D. Unintended effects on individual treaty fisheries, including dislocation and/or disruption, could occur due to unforeseen circumstances of the mass marking and selective fisheries program. The parties will address such potential fishery effects and resolve any conflicts in the course of modeling, evaluation and planning efforts described herein. It is the intent of this section that established treaty/non-treaty sharing principles will be adhered to.

E. WDFW and the Puget Sound tribes other than Makah will develop agreed, comprehensive coho management plans under the frameworks of existing court ordered salmon management and allocation plans, including without limitation the intertribal allocation agreements approved by the court in Subproceeding 86–5, or subsequent stipulations or orders of the court following the expiration of the current agreements. These plans would be partially implemented for Puget Sound stocks with the planning of 1998 fisheries. Full implementation of all elements would occur with the planning of the 1999 season. To meet this requirement, the parties will complete the tasks as described and scheduled in Attachment 1. Development of long-term coho management plans for coastal coho stocks may proceed separately. The parties will encourage involvement by other interested managers to insure that

coastwide coordination needs are met. Agreed coho management plans developed under this provision shall be binding only to the parties thereto absent further orders of the court. Comprehensive coho management plans will include:

1. rules for implementing annual fishing schedules, given expected abundance of wild stocks;

2. definition of spawning escapement levels that would be achieved, on the average, and levels that would avoid unacceptable risks to stock health;

3. fishing regimes (levels of exploitation) for treaty and non-treaty fisheries that are expected to achieve conservation and treaty sharing obligations, and meet inter-tribal and other harvest sharing objectives of the parties;

4. procedures for evaluating performance of annually implemented fishing regimes toward meeting stated goals and objectives, and for modifying the plan accordingly, as may be appropriate;

5. an assessment and refinement of the definition of a viable CWT program (e.g., selection of indicator stocks, tagging levels, sampling rates, sampling methods) that provides for effective implementation, evaluation and assessment of this plan's objectives; and,

6. a habitat component that assesses habitat relative to performance standards and quantitatively estimates the relationship between habitat condition and production.

F. Preseason fishery planning and post-season stock assessments are highly dependent upon the use of management planning tools (models). Recognizing that selective fisheries introduce requirements beyond the capability of existing models, and desiring to minimize any impacts on existing analytical capabilities, the parties are committed to and will cooperatively develop, prior to the 1998 season, modified or new models with the capability of planning and assessing impacts of fishery regimes that include selective fisheries. It is recognized that there will be a one or two year transition period, during which modified versions of currently-available models (modified to accommodate evaluation of selective fisheries) will be replaced with new, improved models with updated capabilities, i.e., that more comprehensively improve analytical capabilities. Consistent with the foregoing, and to meet short term needs, the parties will revise, for review by July 1, 1997, the existing Fishery Regulation Assessment Model (FRAM). In addition, the parties will cooperate in the development and review of improved models for use in the longer term.

G. The parties will participate cooperatively in the Selective Fisheries Evaluation Committee (SFEC) established by the Pacific Salmon Commission (PSC). Working as the bilateral SFEC whenever possible, or independently as may be necessary to accomplish the parties' objectives in a timely manner (e.g., if Canada chooses not to participate or is unable to participate sufficiently to meet the parties' time lines), the parties' will direct their representatives on the SFEC to:

1. evaluate all fishery and hatchery electronic sampling tests conducted during 1996, and provide a summary evaluation by February 15, 1997;

2. in 1997 initiate the development of CWT estimation methods for use under selective fisheries regimes;

3. evaluate any mass marking returns and selective fisheries conducted during 1997. Agency reports on these activities will be distributed to the SFEC by January 15, 1998. The SFEC will provide a summary evaluation of these activities by March 1, 1998;

4. Evaluate as necessary:

a. proposed sample designs for testing sampling technology;

b. new or improved methods for mass marking;

c. adequacy of the CWT single and double index tagging program;

d. implications of revisions in marking programs;

e. sampling programs in selective fisheries, non-selective fisheries, and escapement;

f. the performance of stock assessment models;

g. the success of mass marking and selective fisheries in meeting identified objectives.

H. Any party that authorizes a selective fishery will, itself, or in cooperation with other parties, implement appropriate programs to monitor and evaluate its stock specific impacts. Selective fisheries will be monitored to obtain valid estimates of retained catch and encounter rates, and estimates of the proportion of marked fish caught in all fisheries will be made by February 1 of the following year.

I. Any party that authorizes a selective fishery will, itself, or in cooperation with other parties, develop appropriate education and enforcement pro-

grams to insure compliance with its selective fishery regulations.

J. WDFW will not diminish its priority for habitat protection as a consequence of non-treaty fisheries focusing on hatchery produced fish.

K. Estimates of non-landed fishery mortality caused by any fishery, including selective fisheries, will be accounted for in meeting conservation and allocation objectives.

ATTACHMENT 1

COMPREHENSIVE COHO
WORK PLAN

4/15/97

A. FRAMEWORK

1. Develop and agree to basic framework intent of plan, including goals, objectives, elements, performance standards and mechanisms. The June, 1994 Comprehensive Coho interim report will be the starting point for the framework description. (7/1/97)

B. ESTABLISH ESCAPEMENT POLICY (Intended to be implemented beginning with the 1998 season).

1. Identify escapement policy intent for various management units/stocks (e.g., key wild stocks).

2. Specify exploitation intent and target escapement rates for various abundance levels required to meet spawning escapement intent. (provisional value defined—7/1/97; recommendation provided—11/30/97).

3. Specify intent and values for tolerance ranges around exploitation/escapement rates. (provisional value defined—10/30/97; recommendation provided—11/30/97).

4. Specify various escapement thresholds that trigger management response. (7/1/97; 11/30/97).

5. Define management steps in response to identification of critical management unit/stock status levels. (10/31/97).

C. FISHERY MANAGEMENT (Intended to be implemented beginning with the 1999 season).

1. Decide which fisheries and fishing areas will be managed together. (7/1/97).

2. Specify which fisheries will be managed for which stocks/management units. (7/1/97).

3. Develop annual response mechanisms/rules for different stock status scenarios. (9/30/98).

4. Establish different fishery regimes/levels (e.g., quotas, seasons, exploitation rates, etc.) corresponding to different stock abundances, including selective fisheries, and addressing adjustments to be taken when predicted exploitation rates are outside tolerance ranges. (provisional value defined—8/31/98; recommendation provide—10/31/98)

D. HABITAT MANAGEMENT

1. Specify performance standards, steps and strategies, incorporating traditional knowledge, to protect and restore habitat (potentially from WSP), and the framework under which habitat actions would be taken, given habitat-production model outputs. (provisional–10/31/97; recommendation provided 4/30/98).

2. Identify the process and habitat management actions if predicted escapements fall below critical levels and/or stock productivity declines to unacceptable levels. (provisional 10/31/97; recommendation provided 4/30/98)

E. GENETIC CONSERVATION AND ECOLOGICAL INTERACTION GUIDELINES

1. Define a work plan that will incorporate genetic conservation and ecological interaction goals, objectives, performance standards into the comprehensive coho management plan. (provisional—10/31/97; recommendation provided 11/30/97).

F. HATCHERY PRODUCTION

1. Specify guidelines and standards for coho supplementation. (10/31/97).

2. Define annual and long-term production goals. (review Equilibrium Brood Document). (10/31/97).

G. EVALUATION, MONITORING AND MODIFICATION

1. Develop and modify tools (e.g., simulation models and cohort reconstruction) to evaluate proposed fishery regimes and other management standards or actions (e.g., selective fisheries) taken under the plan (as identified in A–F above). (7/1/97 and 7/1/98).

2. List and prioritize research needs identified during plan development. (12/31/97 and 12/31/98).

3. Specify the parameters and values that will be developed and analyzed during annual performance review of the plan's implementation and describe how to apply analysis results to improvement of the plan. (12/31/98).

4. Identify the process and resource management actions to take if estimated stock capacities or productivi-

ties change significantly from current levels. (provisional 10/31/97; recommendation provided 4/30/98)

5. Describe the process for longer-term (e.g., 4 years) comprehensive review of the plan and procedures for modifying. (12/31/98).

## H. DECISION PROCESS

1. Develop policy decision process work plan and schedule, including any participation required by any potentially effected interests. (7/1/97).

2. Review and reach agreement on plan elements for partial initial implementation in 1998, and full implementation in 1999,—includes evaluating plan's likelihood of meeting defined framework objectives, (partial—11/30/97; full—12/31/98).

3. Develop 1998 work plan for finalizing all elements of the plan for 1999 implementation and long-term implementation, (12/31/97).

## TABLE 1

## 1996 BROOD COHO SPRING MASS MARKING GRAYS HARBOR NORTH AND PUGET SOUND

| Complex | Facility | Total to be Marked | Timeframe | Index | Comments |
|---|---|---|---|---|---|
| Green River | Soos Creek | 600,000 | May | | Crisp Creek production |
| Hood Canal | George Adams@ | 500,000 | June–July | 45K, 45K | |
| Minter Creek | Minter Creek | 1,250,000 | May | 50K | Coulter production |
| Skagit | Marblemount@ | 700,000 | July | 45K, 45K | |
| **PUGET SOUND** | | **3,050,000** | | | |

| Complex | Facility | Total to be Marked | Timeframe | Index | Comments |
|---|---|---|---|---|---|
| Grays Harbor | Bingham Creek | 1,800,000 | May–July | 75K, 75K | Includes Satsop Springs program |
| Grays Harbor | Humptulips@ | 2,000,000 | May–July | 80K, 80K | |
| Grays Harbor | Lk. Aberdeen | 35,000 | May–July | | |
| **GRAYS HARBOR** | | **3,835,000** | | | |

## ORDER GRANTING SWINOMISH MOTION FOR TEMPORARY RESTRAINING ORDER

### Subproceeding 97–2

### (June 16, 1997)

THIS MATTER comes before the court on a motion for temporary restraining order by the Swinomish Indian Tribal Community. Having reviewed the motion together with all documents submitted in support and in opposition, having held a hearing at which oral argument was presented, and being fully advised, the court finds and rules as follows:

Swinomish seeks an order temporarily restraining the Upper Skagit Tribe from engaging in a crab shellfishery within the exterior boundaries of the Swinomish Reservation and within that portion of Washington Department of Fisheries (WDF) Area 8 north of a line running from Snatelum Point on Whidbey Island and extending east to, but not including Camano Is-

land and further excluding that portion of WDF Area 8 adjacent and subjacent to Camano Island.

It is undisputed that Swinomish and Upper Skagit entered into an interim agreement in March of 1994. On the face of that agreement, Upper Skagit agreed not to conduct any commercial or subsistence shellfishery within the Swinomish Reservation without Swinomish's consent or any commercial shellfish harvest north of the Snatelum Point line described above without a written agreement between Swinomish and Upper Skagit.

■ Based on the evidence currently on the record in this case, the court finds that Swinomish has shown a likelihood of success on the merits as well as the possibility of immediate and irreparable injury if Upper Skagit is not temporarily restrained from engaging in the crab shellfishery set forth in Upper Skagit Regulation CRB97–002 issued on May 19, 1997.

Swinomish's motion is accordingly GRANTED. It is hereby ordered that the Upper Skagit Tribe, its officers, agents, servants, employees and attorneys, and those in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are immediately severally and jointly temporarily restrained from harvesting crab in WDF Area 8 north of a line running from Snatelum Point and extending east to, but not including Camano Island and further excluding that portion of Area 8 adjacent and subjacent to Camano Island, and from within the exterior boundaries of the Swinomish Reservation. This temporary restraining order is in effect until June 26, 1997.

A bond in the amount of $10,000 shall be posted by Swinomish. This order becomes effective upon delivery of the bond to the Clerk of Court.

## ORDER GRANTING SWINOMISH TRIBE'S MOTION FOR PRELIMINARY INJUNCTION

### Subproceeding No. 97–2

### (July 30, 1997)

THIS MATTER comes before the court on a motion by the Swinomish Indian Tribe (Swinomish) seeking to enjoin the Upper Skagit Indian Tribe (Upper Skagit) from opening fisheries which Swinomish deems to be in violation of an Interim Agreement and Stipulation entered into between the two tribes. Having reviewed the pleadings filed in support of and in opposition to the motion together with the testimony of witnesses both live and through declarations, and having heard argument of counsel, the court finds and rules as follows:

## I. RELIEF SOUGHT

While the matter comes before the court on a motion for preliminary injunction, the parties agree that they have presented to the court all of the evidence and briefing relevant to the issues in this case.[1] That being the case, the court finds that there is no reason not to rule on the merits of the case, to wit: What is the import of the Interim Agreement, and how does it affect the rights of Upper Skagit to open the fisheries it seeks to conduct?

## II. BACKGROUND

In May of 1989, various Indian tribes filed subproceeding 89–3 ("the shellfish

---

1. The court has taken under advisement the issue of the "all citizens fishery" and its connotation in the context of the Interim Agreement and will not be addressing that issue in this order.

case") asserting a treaty right to shellfish. At the time, the issue as to whether Upper Skagit could establish an expanded usual and accustomed fishing area in Washington Department of Fisheries Area 8 (WDF Area 8) was a contentious one among the tribes. In order to present a united position and to avoid intertribal disputes complicating the shellfish case, Upper Skagit attempted to resolve its differences with the other tribes by means of agreements. To that end, it entered into settlement agreements with the Tulalip Indian Tribe, the Lummi Indian Tribe and Swinomish. It is the Interim Agreement between Swinomish and Upper Skagit that gives rise to the subproceeding currently before this court.

The Interim Agreement provides that Upper Skagit will not commercially harvest shellfish in WDF Area 8 within the exterior boundaries of the Swinomish Reservation, within Turner's Bay, and north of a line running from Snatelum Point on Whidbey Island and extending east to Camano Island. Furthermore, Upper Skagit agreed not to conduct subsistence shellfish harvests within the exterior boundaries of the Swinomish Reservation or north of the Snatelum line in any areas that Swinomish was "managing and harvesting as commercial shellfish areas."

## III. THE DISPUTE

■ Upper Skagit essentially agrees with the above description of the agreement. What is in dispute is the meaning of certain terms within the agreement. The parties have vastly differing views on the import of these terms. To resolve these differences, the court heard evidence about the context in which the agreement was negotiated, bearing in mind that while testimony may be helpful in clarifying terms used in the agreement, it may not be used to change or rewrite the agree-

ment entered into by the parties. *U.S. Life Credit Life Ins. Co. v. Williams,* 129 Wash.2d 565, 919 P.2d 594 (1996).

Both of the negotiators of the Interim Agreement testified: Lorraine Loomis on behalf of Swinomish, and Doreen Maloney on behalf of Upper Skagit. In essence the parties' disagreement revolves around two issues: 1) The meaning of the term "shellfish"; and 2) the nature of the commercial management exclusion.

### A. Meaning of the term "shellfish"

■ Upper Skagit contends that the term "shellfish" as used in the agreement was intended by the parties to include only clams and other embedded shellfish. Upper Skagit offered testimony that neither Lorraine Loomis nor Doreen Maloney specifically referred to other species of shellfish during the negotiations but rather that their discussions centered on clams and beaches. Swinomish responds that there was no need to be specific because it was well established that the term shellfish encompassed all kinds of shellfish including crab, shrimp, and geoducks as well as clams.

It is clear from the testimony that, taken in the context in which it was negotiated, the agreement encompasses all shellfish. The agreement was negotiated against the background of subproceeding 89–3. In that case, all of the tribes, including Upper Skagit, recognized the importance of giving the term shellfish the broadest possible meaning. Any tribe using the word would have reasonably expected it to be given the broadest meaning and to be inclusive of all shellfish species.

Furthermore, Upper Skagit negotiated two other agreements in the same time frame, one with the Lummis and one with the Tulalips. In both of those agreements, the term "shellfish" was used in its broadest meaning to include all shellfish species.

If Upper Skagit intended shellfish to have a completely different and narrower meaning in the context of its agreement with Swinomish, it would have had to make that meaning clear in the language of the document. Knowing that the question of fishing rights between the two tribes was seriously contested, Upper Skagit had to state its meaning very precisely and clearly if it intended fewer limits on its intrusion into Swinomish's area. Upper Skagit could not rely on a unilateral intent to give the term "shellfish" an unexpectedly narrow meaning not explained in the specific language of the agreement.

B. Meaning of the commercial management exclusion

■ Both tribes concur that the agreement intended to · exclude subsistence shellfishing by Upper Skagit in areas managed and harvested as commercial shellfish areas by Swinomish. What the parties dispute is whether the Interim Agreement was intended to limit the exclusion to those areas that were already being managed as commercial areas at the time the Interim Agreement was signed by the parties, namely WDF Beach # 240150 and WDF Beach # 240140 in Penn Cove, or whether the exclusion would also apply to all future commercially managed areas.

Upon reviewing the evidence surrounding the negotiations leading up to the final agreement, the court finds that it is clear that the agreement was intended to also cover future commercial areas. By letter dated August 25, 1993, Doreen Maloney wrote to Lorraine Loomis:

1. We are willing to agree to an interim management plan under which Upper Skagit would be able to exercise its treaty right to harvest shellfish, both subsistence and commercial, in Areas 8 and 8A except as follows:

... Penn Cove: subsistence shellfishing only in areas outside of current Swinomish commercial shellfish harvesting, specifically those portions of WDF Beach # 240150, and WDF Beach # 240140 in Penn Cove. (emphasis added)

Allan E. Olson, Swinomish tribal attorney, responded to Ms. Maloney in a letter dated October 15, 1993:

Lorraine asked me to convey to you one change to the Upper Skagit proposal (August 25, 1993) on shellfish harvest in Skagit Bay . . . .

The change is in your first paragraph. . . . Subsistence shellfishing would be permitted north of the Snatelum Point line, but no subsistence shellfishing would be permitted in Swinomish commercial shellfish harvesting areas.

Please let me know if this reflects your discussions with Lorraine and whether or not this is acceptable to the Upper Skagit Indian Tribe.

Most significantly, the Olson letter deletes any use of the word "current" and any limitation to the two specific beaches then under commercial management. On November 2, 1993, Doreen Maloney wrote to Lorraine Loomis essentially adopting the language proposed by Mr. Olson and indicating that Upper Skagit agreed to it. The draft sent by Allan Olson to Harold Chesnin, tribal attorney for Upper Skagit, adheres to the language presented in the Olson letter of October 15, 1993.

The final agreement contained the language as drafted by Swinomish. Upper Skagit signed the agreement without its own proposed language that would have included the limited exclusion it now urges the court to read into the agreement. There is nothing in the current language of the agreement or the surrounding context that supports the interpretation propounded by Upper Skagit. On the contrary, all

of the evidence supports Swinomish's contention that Upper Skagit agreed <u>not</u> to conduct subsistence fishing wherever Swinomish was engaged in commercial harvesting.

## IV. IRREPARABLE HARM

Since the court finds that Swinomish prevails on the meaning of the Interim Agreement, the court need not address the issue of irreparable harm. However, if the court did so, it would find that, on the evidence before it, there would be irreparable harm to Swinomish if Upper Skagit were allowed to fish as its regulations now provide.

## V. CONCLUSION

Swinomish's motion for preliminary injunction is hereby GRANTED. Upper Skagit is enjoined from implementing regulations that conflict with the express language of the Interim Agreement.

## STIPULATION REGARDING S'KLALLAM TRIBES' USUAL AND ACCUSTOMED FISHING PLACES

### Sub–Proceeding No. 89–2

### (February 11, 1998)

**COME NOW** the parties hereto, the Lummi Nation by and through its undersigned attorney, Daniel A. Raas of the Office of Special Counsel—Raas, Johnsen & Stuen, P.S., and the Jamestown S'Klallam, Lower Elwha S'Klallam, and the Port Gamble S'Klallam Indian Tribes, being represented by Kathryn Nelson of Eisenhower Carlson, PLLC, and stipulate as to the issues in this subproceeding:

1. This subproceeding concerns the usual and accustomed fishing grounds and stations of the present day Lummi Nation.

2. This subproceeding does not concern, and the parties do not intend to ask the Court to decide, any questions regarding the usual and accustomed fishing grounds and stations of the Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam, or any one of these tribes.

### ORDER

The foregoing Stipulation is hereby approved.

## ORDER REGARDING CROSS–MOTIONS FOR PRELIMINARY INJUNCTION

### Subproceeding 96–1

### (June 18,1998)

In May, 1997, the Quileute Indian Tribe, the Makah Indian Tribe and the Quinault Indian Nation (the "Settling Tribes") entered into a Settlement Agreement designed to resolve the inter-tribal disputes raised in Subproceeding 96–1. The Settlement Agreement established a management and allocation scheme for the Settling Tribes' blackcod fisheries.

In 1998, the Settling Tribes began operating their blackcod fisheries under the terms of the Agreement. However, during the course of the season a series of disputes erupted over the proper interpretation of the Agreement. The facts surrounding these disputes are set out in detail in the parties' briefs and, therefore, will not be repeated here.

Having considered the entire factual record and the briefs and the arguments of counsel, the Court HEREBY DECLARES AND ORDERS as follows:

1. Under sections 1 and 12 of the Settlement Agreement, Quinault tribal members cannot fish for blackcod on Hoh vessels when the Quinault fisheries are closed pursuant to the Agreement. Section 6 does not allow members of the Settling

Tribes to fish on Hoh vessels during closed periods because such fishing would circumvent the entire purpose of the Agreement which is to allocate fishing opportunity between the Settling Tribes. Prohibiting Quinault members from fishing on the Hoh vessel during closures will not restrict the Hoh Tribe's participation in the fishery. The Hoh's stated reason for relying on Quinault assistance is that the Hoh Tribe requires training to participate in the blackcod fishery. The Hoh, however, have already had training during a part of this season and there is a Hoh tribal member presently able to skipper a Hoh vessel. Any additional training required by the Hoh can be obtained by means other than using Quinault members during closures. The Hoh, for example, can send tribal members to observe or actually fish on vessels owned by the Quileute and Quinault. The Hoh can also learn to fish from other Hoh members who received training this season.

2. If Quinault members fish on Hoh vessels during periods when the Settling Tribes' blackcod fisheries are open, the catch shall be allocated in the following manner. During the "B" & "C" fisheries the entire catch shall be counted against the B or C quotas, as the case may be. During the opening of the Quinault Nation's "A" fishery, the Quinault "A" share shall be assessed a share of the Hoh/Quinault catch in proportion to the compensation which will be presumed to be paid the Quinault fisherman. The Court presumes that the overall crew share is equivalent to 35% of the catch, 45% of the catch is used for overhead and 20% of the catch is for the skipper. Accordingly, the assessment against the Quinault "A" share shall equal 35% of the joint catch multiplied by the ratio of Quinault crewmembers to total crew members on the vessel. For example if there are 4 crew members, one of whom was a Quinault tribal member,

8.75% of the joint catch would be assessed against the Quinault "A" fishery. In making this ruling, the Court recognizes that the parties have not submitted evidence on the issue of whether the presumed crew share correctly reflects the wages paid to crew members on the Hoh vessel. Therefore, the Court is willing to reconsider these figures if the parties offer additional evidence. The remainder of the joint catch shall be assessed equally against the Settling Tribes' "A" shares.

■ 3. In its motion for a preliminary injunction, the Quinault requested a head start on the "C" fishery this year. The Quinault contended that they did not have adequate notice of a Quileute and Makah decision to reopen the "B" fishery on April 22, 1998 and that a head start was necessary to remedy the injury allegedly done by the inadequate notice. The Court disagrees and denies the Quinault's request for a head start. The Court finds that the emergency opening of the "B" fishery was sui generis and is thus unlikely to reoccur in the future once guidance has been given on the proper interpretation of the Settlement Agreement. Under the circumstances, Makah and Quinault could not have provided the Quinault with earlier notice. Moreover, the Court finds that the Quinault's actions precipitated the crisis that lead to the opening and therefore, the Quinaults are not entitled to any equitable relief.

4. The Quinault also asked this Court to establish a notification period for future openings of the blackcod fishery under the Settlement Agreement. The Quinault suggest that 72 hours notification should be required before a Tribe opens its fishery. On the record before the Court, it is impossible to determine exactly what notification period is most appropriate. Therefore, the Settling Tribes are directed to try and negotiate a mutually acceptable notifi-

cation period which can be used for future openings under the Settlement Agreement. If the Settling Tribes are unable to do so, the Court will consider imposing a uniform notification period based on a full evidentiary record.

5. The Quileute and Makah also moved this Court for an order establishing an allocation scheme for any Hoh catch caught during the Settling Tribes' "A" fisheries. Under the Settlement Agreement, the "A" fisheries were designed to provide each of the Settling Tribes with a fixed equal share of blackcod. The fairest manner to preserve this agreed sharing arrangement for the "A" fishery is to charge all the Settling Tribes equally with a share of the Hoh catch caught when <u>any</u> Tribes' "A" fishery is open. This equal sharing shall <u>not</u> cease because one or more Tribes conclude their "A" fisheries first. Any overages of a Settling Tribe's "A" share caused solely by the allocation of the Hoh catch occurring after a Settling Tribe's fishery has closed shall be charged to the offending Tribe on a one to one basis in the following year but only to the extent that the overage deprived another Tribe of a portion of its "A" share.

6. The Quinault portion of the Hoh/Quinault catch which was landed prior in 1998 prior to this Court's ruling shall be assessed against the Quinault's "A" share in the manner set out in ¶ 2 above.

ORDER GRANTING RESPONDENT'S MOTION TO DISMISS IN PART, GRANTING PETITIONERS' MOTION TO STRIKE IN PART AND SCHEDULING PRETRIAL CONFERENCE

Subproceeding 97–1

(August 5, 1998)

I. BACKGROUND

The Swinomish, Suquamish and Puyallup (three Tribes) have asked the court to interpret Judge Boldt's Finding of Fact (FOF) 76. FOF 76 defines the Muckleshoot's usual and accustomed fishing places (U & A):

> Prior to and during treaty times, the Indian ancestors of the present day Muckleshoot Indians had usual and accustomed fishing places primarily at locations on the upper Puyallup the Carbon, Stuck, White, Green, Cedar and Black Rivers, the tributaries to these rivers (including Soos Creek, Burns Creek and Newaukum Creek) and Lake Washington, and secondarily in the saltwater of Puget Sound.

*United States v. State of Washington,* 384 F.Supp. 312, 367 (1974). In dispute is what areas Judge Boldt intended "Puget Sound" to encompass. The three Tribes argue that the Muckleshoot's saltwater treaty fishing places under FOF 76 are limited to Elliott Bay. They seek a declaratory judgment that the Muckleshoot's U & A does not include waters within Department of Fisheries Areas 10, 11 or waters West and North of Area 10 and an injunction preventing the Muckleshoot from fishing those areas. The Muckleshoot argue that the term "Puget Sound" cannot be interpreted to limit its fishing area to Elliott Bay and that Judge Boldt intended the phrase "Puget Sound" to include the inside marine waters from the Canadian border to Olympia in the Muckleshoot's U & A.

The three Tribes have filed a motion for summary judgment. The Muckleshoot have filed a cross motion to dismiss. The three Tribes have also filed a motion to strike portions of the Muckleshoot's brief in opposition to their summary judgment motion and two documents in support of that brief: Dr. Barbara Lane's 1998 affidavit and a 1993 shellfish report by Dr. Lane

and Lynn Larson. While these motions were pending, the Ninth Circuit Court of Appeals issued an opinion in *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (1998). This court asked the parties to file supplemental briefing to address what if any impact the Ninth Circuit's opinion had on the pending motions.

## II. DISCUSSION

### A. Ninth Circuit's Muckleshoot Opinion

In *Muckleshoot*, the Ninth Circuit upheld this court's determination that the Swinomish do not have fishing rights in Area 10 of Puget Sound by virtue of a reference to "Whidbey Island" in FOF 5. The Ninth Circuit, however, reversed this court's determination of the meaning of the phrase "present environs of Seattle" with respect to the Lummi's U & A. The Ninth Circuit held that this court erred in considering Dr. Lane's understanding of the phrase, which she articulated in a 1995 deposition, to determine Judge Boldt's intent. And it held that the court erred in relying on paragraph 25.f as authority to clarify the meaning of terms used in the decree or to resolve an ambiguity with supplemental findings. The Ninth Circuit held that paragraph 25.a was the source of the court's authority to consider such matters. Finally, the Ninth Circuit held that the court should have given the Lummi an opportunity to present additional evidence on the meaning of "environs of Seattle." The Ninth Circuit remanded for further proceedings consistent with its opinion under subparagraph 25.a.

The Ninth Circuit's opinion in *Muckleshoot* is relevant to three issues in this case. One, whether the term FOF 76 is ambiguous. Two, the court's jurisdiction over the three Tribes' claims. And three, whether the court can consider evidence outside the record before Judge Boldt in resolving any ambiguities in FOF 76.

### B. Motion to Dismiss/Summary Judgment

The three Tribes seek a declaratory ruling that the Muckleshoot do not have fishing rights in Areas 10, 11 and points beyond. Both sides agree that the Muckleshoot have fishing rights in 10A, which is Elliott Bay. With respect to areas 9, 10 and 11, the Muckleshoot argue that the three Tribes' claim should be dismissed for lack of ambiguity. With respect to the areas beyond Areas 9, 10, and 11, the Muckleshoot argue that the claim should be dismissed because the court does not have continuing jurisdiction over it.

### 1. Ambiguity

As a threshold issue, the court must decide if the term "Puget Sound" is ambiguous. Whether an ambiguity exists is a question of law. *State Farm Mut. Auto. Inc. Co. v. Fernandez*, 767 F.2d 1299, 1301 (9th Cir.1985). A judgment is ambiguous if it is "susceptible to more than one interpretation." *Narramore v. United States*, 852 F.2d 485, 490 (9th Cir. 1988). Where a judgment is susceptible to two interpretations, the court should adopt an interpretation that renders the judgment "more reasonable, effective and conclusive in light of the facts and the law of the case." *Pen–Ken Gas & Oil Corp. v. Warfield Natural Gas Co.*, 137 F.2d 871, 885 (6th Cir.1943). If a judgment is unambiguous, the court may not consider extraneous evidence to explain it. *Narramore*, 852 F.2d at 490. If a "a judgment is ambiguous or fails to express the rulings with clarity, the entire record before the issuing court and the findings of fact may be referenced in determining what was decided." *Muckleshoot*, 141 F.3d at 1359. The court must construe the judgment "to give effect to the intention of the issuing court." *Narramore*, 852 F.2d at 490.

 Ambiguity may be intrinsic or extrinsic. Intrinsic ambiguity is present when a judgment is unclear on its face. *U.S. v. National Steel Corp.*, 75 F.3d 1146, 1149 (7th Cir.1996). An extrinsic (or latent) ambiguity exists when the ambiguity is not apparent on the face of the instrument, but it becomes apparent when the instrument is applied to the facts as they exist. *Matter of Estate of Bergau*, 103 Wash.2d 431, 436, 693 P.2d 703 (1985).

The three Tribes contend that the term "Puget Sound" is ambiguous in light of the record. And they argue that Judge Boldt's reference to a primary and secondary dichotomy (in the phrase "secondarily in the saltwater of Puget Sound") renders FOF 76 inherently ambiguous. They contend that the Muckleshoot's predecessors were upriver Indians with fisheries primarily in the freshwater of the Duwamish drainage who descended to fish at the river's mouth in Elliott Bay. The record, they argue, contains no evidence that they fished in the open marine waters beyond Elliott Bay. They argue that there is no factual dispute regarding the record that was before Judge Boldt when he entered FOF 76 and summary judgment, therefore, is appropriate. The Muckleshoot argue that there is no textual ambiguity in FOF 76 and the court, therefore, has no authority to issue a new finding interpreting Judge Boldt's original finding.

FOF 76 is ambiguous because it is susceptible to more than one interpretation. The Muckleshoot argue that "Puget Sound" encompasses the entire inside marine waters from the Canadian border to Olympia. The three Tribes argue that "Puget Sound" is not a phrase that is used consistently and there is no set description of which waters are included in Puget Sound. Furthermore, Judge Boldt's use of the term "secondarily" to describe the Muckleshoot's U & A in Puget Sound is

ambiguous. As the three Tribes argue, Judge Boldt may have used the term "secondarily" to indicate that the Muckleshoot made more restricted use of saltwater fisheries than their river fisheries listed in FOF 76. And, if so, it is not clear if the restriction is one of frequency, species, amount or geography.

## 2. Evidence admissible to resolve an ambiguity

Because the phrases "Puget Sound" and "secondarily" are ambiguous, the next issue is what evidence the court can consider to resolve the ambiguity. The three Tribes contend that the Ninth Circuit's *Muckleshoot* opinion forecloses consideration of evidence that was not in the record before Judge Boldt. They argue that the opinion allows extra record evidence only if the record does not contain any evidence clarifying the issue before the court and the ambiguity, therefore, cannot be resolved from the record. The three Tribes argue that the ambiguity in this case can be resolved by reference to the record alone. The Muckleshoot maintain that there is no ambiguity. But, if the court finds otherwise, they argue that the Ninth Circuit's *Muckleshoot* opinion only bars imputation of Dr. Lane's personal understanding of the record to Judge Boldt; it does not otherwise bar this court's consideration of other evidence.

The Ninth Circuit held that this court "correctly determined that 'the key to resolving the controversy lies in determining what Judge Boldt meant in precise geographic terms by his use of the phrase "the present environs of Seattle." ' " 141 F.3d at 1358. It held, however, that this court erred in concluding that Judge Boldt's intended meaning could be determined by reference to what Dr. Lane later testified <u>she</u> intended the phrase to mean in her reports to Judge Boldt. The Ninth

Circuit held that Dr. Lane's latter-day testimony is extraneous to the decree and the underlying record and that its admission was in error. It observed, however, that on remand "[i]t will be up to the parties to offer admissible evidence to enable the district court to interpret the decree in specific geographic terms. While evidence that was before Judge Boldt when he made his finding is obviously relevant, there may be <u>other evidence</u> indicative of the contemporary understanding of 'the present environs of Seattle.'" 141 F.3d at 1359 (emphasis added). Since the Ninth Circuit explicitly stated that this court can consider evidence besides evidence before Judge Boldt when he made his finding, it is not foreclosed from considering extra record evidence. It is, however, foreclosed from imputing someone else's understanding of a phrase to Judge Boldt.

The court rejects the three Tribes' argument that it can only consider extra-record evidence if it cannot resolve the ambiguity from the record before Judge Boldt. Nothing in the Ninth Circuit's *Muckleshoot* opinion compels this type of restriction. While the evidence before Judge Boldt is unquestionably the most relevant and persuasive in determining his intention, the court does not need to make a separate inquiry to determine if it can go outside the record in the first place.

3. Continuing jurisdiction (Areas beyond 9, 10, 11)

 In *Muckleshoot* the Lummi were currently taking fish in the disputed area. The Ninth Circuit remanded with instructions to proceed under subparagraph a because the court was presented with a controversy over whether a party's actions were in conformity with the injunction; namely, whether the southern portion of the areas in which the Lummi were currently taking fish was in conformity with the decree. Here, the Muckleshoot have no present intention of fishing in areas beyond Areas 9, 10, and 11. And they argue that the court does not have jurisdiction over the three Tribes' motion for summary judgment with respect to those areas under either subparagraph a or f.

The Muckleshoot argue that the court cannot make a supplemental finding under subparagraph f under *Muckleshoot* to determine their fishing rights in areas beyond Areas 9, 10, and 11. The court agrees that *Muckleshoot* forecloses this approach. In *Muckleshoot*, as an alternative holding, this court made a supplemental finding of fact under paragraph 25.f, which reserved continuing jurisdiction to determine "the location of a tribe's usual and accustomed fishing grounds not specifically determined" by Judge Boldt. The Ninth Circuit ruled that this alternative holding could not be upheld. It held that this court did not have jurisdiction under subparagraph f to make a supplemental finding to determine the location of Lummi's U & A because Judge Boldt had already made that determination, albeit using an ambiguous description. And it remanded with specific instructions to proceed under subparagraph 25.a, which reserves continuing jurisdiction to determine "whether or not the actions ... by any party ... are in conformity with" the injunction in *United States v. Washington*.

Here, as in *Muckleshoot*, Judge Boldt has already made a finding of fact determining the location of Muckleshoot's U & A. Although his description may have turned out to be ambiguous, he did make a specific determination. Subparagraph f "does not authorize the court to clarify the meaning of terms used in the decree or resolve an ambiguity with supplemental findings which alter, amend or enlarge upon the description in the decree." *Muckleshoot*, 141 F.3d at 1359. Issuing a

supplemental finding under subparagraph f defining the scope of Muckleshoot's U & A in Puget Sound would "alter, amend or enlarge upon" Judge Boldt's description, contrary to the Ninth Circuit's holding in *Muckleshoot.*

The Muckleshoot also argue that this court cannot make a decision under subparagraph a about whether their actions in areas beyond Areas 9, 10, and 11, are "in conformity with" the injunction because they are not currently fishing in those areas nor do have they have a present stated intention to do so. Since they do not intend to fish in those areas, the petitioners' claim does not require a determination as to whether "actions, intended or effected by any party" are in conformity with the permanent injunction with respect to those areas. The Muckleshoot argue, therefore, that the court does not have jurisdiction to adjudicate their fishing rights in those areas.

The court notes that the Muckleshoot's argument is at odds with their argument that Judge Boldt's use of the term "Puget Sound" means the inside marine waters from the Canadian border to Olympia, an area that encompasses marine waters beyond Areas 9, 10, and 11; they are claiming a U & A that extends beyond Areas 9, 10, and 11, yet they contend the court cannot resolve this issue because they have no stated intention to fish those areas at this time. Nonetheless, the court agrees with the Muckleshoot that pursuant to the Ninth Circuit's opinion in *Muckleshoot*, it does not have jurisdiction under subparagraph a to resolve the petitioners' claims with respect to areas outside Areas 9, 10, and 11 at this time because the Muckleshoot have not manifested an intent to fish in those areas. The court, therefore, grants the Muckleshoot's motion to dismiss with respect to areas outside Areas 9, 10, and 11, and reserves the question of whether those areas are part of the Muckleshoot's U & A.

### 5. Need for an evidentiary hearing

 The Three Tribes argue that there is no need for an evidentiary hearing and that the court can and should make its determination solely from the record evidence. As discussed above, however, the Ninth Circuit's reference to "other evidence" outside what was before Judge Boldt clearly allows the court to hold an evidentiary hearing and consider new evidence of his intent. The court, therefore, will hold an evidentiary hearing for the purpose of determining whether Judge Boldt intended to include Areas 9, 10 and 11, in his definition of Puget Sound. At the hearing, the court will consider relevant extra record evidence in support of the parties' positions. Although the court will hear argument on and consider evidence already in the record, the purpose of the upcoming evidentiary hearing will be limited to admitting evidence not already in the record. The parties should be prepared to argue and address whether Judge Boldt intended to restrict Muckleshoot's U & A in the Puget Sound by finding that they had usual and accustomed fishing areas primarily upriver and only "secondarily in the saltwaters of Puget Sound." And, if he did intend to so restrict their fishing rights, how (i.e. geographically, temporally or otherwise).

### C. Motion to Strike

The three Tribes move to strike portions of the Muckleshoot's brief, appendix and affidavit of Barbara Lane. The court hereby grants that motion in part. The court will consider extra record evidence as long as it is relevant to determining Judge Boldt's intention.

## III. CONCLUSION

The court GRANTS respondent's motion to dismiss [docket 46–1], GRANTS the petitioners' motion to strike [docket 66–1], and DENIES petitioners' motion for summary judgment [docket 49–1]. The court hereby schedules a pretrial conference for Tuesday September 1 at 1 p.m. At the pretrial conference, the court will set a date for the evidentiary hearing. The parties shall submit to the court no later than August 28 a joint pretrial order setting forth any discovery requests or issues that need to be resolved by the court, the expected length of the evidentiary hearing, and a list of proposed witness and exhibits.

## ORDER DENYING LUMMI'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND GRANTING THE FOUR TRIBES' MOTION TO DISMISS

### Subproceeding No. 89–2

### (September 2, 1998)

THIS MATTER comes before the court on the Lummi's motion to dismiss or in the alternative for summary judgment. The court has reviewed the documents filed in support of and in opposition to the motion together with the relevant files. Being fully advised, the court denies the motions.

### I. BACKGROUND

In *Boldt I*,[1] Judge Boldt determined that the Lummi's usual and accustomed fishing areas (U & A) comprised of "the marine areas of Northern Puget Sound from the Fraser River south to the present environs of Seattle." Findings of Fact (FOF) 45 and 46. In 1989, the Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam and Skokomish tribes (Four Tribes) initiated this sub-proceeding seeking a determination that the Lummi's U & A does not include the Strait of Juan de Fuca, Admiralty Inlet or the mouth of the Hood Canal. The court instructed the parties to file cross motions for summary judgment on the extent of the Lummi's U & A and on the availability of equitable defenses. On February 15, 1990, Judge Coyle filed an order disposing of these motions. He found that Judge Boldt had not intended to include the Strait of Juan de Fuca, Admiralty Inlet or the mouth of the Hood Canal in the Lummi U & A:

There is no question in the court's mind from the evidence presented to Judge Boldt that the Lummis' usual and accustomed fishing places were not intended to include the Strait of Juan de Fuca. The court is further persuaded that the mouth of the Hood Canal would not be an area which Judge Boldt would have intended to include in the Lummis' usual and accustomed fishing places. These conclusions are based upon the testimony of Dr. Lane when looking at a map of the area. While Admiralty Inlet is not part of Puget Sound, it runs into Puget Sound and is in the general area at least of the environs of present-day Seattle. Nonetheless, while Puget Sound is referred to in the evidence before Judge Boldt, Admiralty Inlet is not referred to by name in Dr. Lane's evidence and she states that she did not intend to express any opinion with regard to Lummis' usual and accustomed fishing rights in this area. Consequently, the court concludes from the evidence presented to him that Judge Boldt did not intend Admiralty Inlet to be part of the Lummis' usual and accustomed fishing places.

*United States of America v. State of Washington*, subproceeding 89–2, February 15, 1990, Decision and Order re Cross–

---

1. *United States of America v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974).

Motions for Summary Judgment (*Decision*) at 13–14.

Judge Coyle's decision resolved all of the issues before him in the cross-motions for summary judgment. Before he issued his decision, the Lummi asserted another request for determination. This request sought a declaration that the Lummi U & A included the waters of the Strait of Juan de Fuca east from the Hoko River to the mouth of Puget Sound, the waters west of Whidbey Island, Admiralty Inlet, the waters south of Whidbey Island to the present environs of Seattle, and the waters of Hood Canal, south of Admiralty Inlet to a line drawn from Termination Point due east across Hood Canal.[2] The Lummi's request is worded differently from the Four Tribes' original request. The Four Tribes contend, however, the Lummi's cross-request covers essentially the same areas the Four Tribes challenged in the initial request for determination. The Lummi have not asserted that their cross-request covers a different area from the area covered by the Four Tribes' initial request and by Judge Coyle's decision. Rather, they argue that Judge Coyle's decision is not final and is of no precedential value. The court can discern no difference between the two requests for determination, nor have the Lummi convincingly argued that there is a difference. Thus, this order is intended to resolve both requests for determination.

The Lummi move for summary judgment and dismissal. They contend that Judge Coyle's February 15, 1990, order remains subject to revision since the court never entered a final judgment on the order. See Fed.R.Civ.P. 54(b). They contend that the law of the case doctrine does not insulate Judge Coyle's order from review because the Ninth Circuit Court of Appeals' recent decision in *Muckleshoot Tribe v. Lummi Indian Tribe*,[3] is an intervening change in the law that vitiates the law of the case doctrine. The Four Tribes cross-move to dismiss this subproceeding with prejudice. They argue that Judge Coyle's February 15, 1990, order was a final adjudication of the merits of their request for a determination and that the Ninth Circuit's *Muckleshoot* opinion does not affect the finality of the order.

## II. DISCUSSION

In *Muckleshoot*, the Ninth Circuit reversed this court's determination of the meaning of the phrase "present environs of Seattle" with respect to the Lummi's U & A. The Ninth Circuit held that this court erred in considering Dr. Lane's understanding of the phrase, which she articulated in a 1995 deposition, to determine Judge Boldt's intent in 1973. The Ninth Circuit held that this court "correctly determined that 'the key to resolving the controversy lies in determining what Judge Boldt meant in precise geographic terms by his use of the phrase "the present environs of Seattle." ' " 141 F.3d at 1358 (citation omitted). It held, however, that this court erred in concluding that Judge Boldt's intended meaning could be determined by reference to what Dr. Lane later testified she intended the phrase to mean in her reports to Judge Boldt. Thus, under *Muckleshoot*, subsequent courts resolving any ambiguities in Judge Boldt's determination of a party's U & A must endeavor to determine what he intended certain words or phrases to mean without imputing someone else's understanding of the word or phrase to him.

2. See Lummi's Amended response to requesting tribes' request for determination and cross-request for determination, D. 11690.

3. 141 F.3d 1355 (1998).

The Lummi argue that Judge Coyle's decision cannot stand in light of *Muckleshoot* because his consideration of the record before Judge Boldt was "distorted" by an affidavit Dr. Lane prepared in 1989 for this subproceeding. They urge this court to disregard Judge Coyle's opinion and grant them summary judgment. The Four Tribes respond that it is clear from Judge Coyle's opinion that he made his determination of Judge Boldt's intent solely from the record before Judge Boldt in 1973.

The court agrees with the Four Tribes that, reading Judge Coyle's order as a whole, it is abundantly clear that he relied only on evidence that was before Judge Boldt in 1973 in determining the Lummi's U & A. He stated that he would look "only to the evidence before the court whose judgment [was] being interpreted." *Decision* at 2, n. 1. He correctly cited the rule that a reviewing court must " 'construe a judgment so as to give effect to the intention of the issuing court.' " *Id.* at 4.[4] And that the judgment must be read and interpreted in light of what was before the court when it issued the judgment. *Id.* at 5. Judge Coyle concluded that FOF 46 is ambiguous and stated that he would examine "the *evidence presented to Judge Boldt* in connection with the underlying proceeding" to resolve the ambiguity. *Id.* (emphasis added). Judge Coyle held that there was no question in his mind "*from the evidence presented to Judge Boldt*" that the Lummi's U & A was not intended to include the Strait of Juan de Fuca, that "*Judge Boldt would [not] have intended* to include" the Hood Canal in the Lummi's U & A and that "*Judge Boldt did not intend* Admiralty Inlet to be part of the Lummi's" U & A. *Id.* at 13–14 (emphasis added). There is no indication in Judge Coyle's decision that he relied on anything outside the record before Judge Boldt in 1973 in interpreting FOF 45 and 46.

The Lummi argue that Judge Coyle's references to one of Dr. Lane's affidavits demonstrate that he improperly relied on evidence outside the 1973 record and that this was error under *Muckleshoot*. This argument is misplaced. Unlike this court, Judge Coyle not rely on Dr. Lane's opinion to determine what Judge Boldt had intended. The affidavit Judge Coyle referred to, furthermore, was prepared primarily to authenticate documents that had been admitted before Judge Boldt in 1973 in order to spare the parties and the court the trouble of locating the original documents in the court record, not to clarify Judge Boldt's intention. *Decision* at 5–8. Although in the affidavit Dr. Lane clarifies some of the evidence she offered at the 1973 proceeding, she did not present any new evidence in the affidavit submitted to Judge Coyle. And, even if she had, there is no indication that Judge Coyle imputed her opinion to Judge Boldt. The Ninth Circuit's *Muckleshoot* opinion, therefore, is inapplicable in this case. The court can conceive of no reason why it should disturb the law of this case as articulated by Judge Coyle in his February 15, 1990, decision. Accordingly, the court adopts the findings and rulings in that decision. Because this issue is dispositive, the court does not address the parties' other arguments.

### III. CONCLUSION

The court determines that Judge Boldt did not intend to include the Strait of Juan de Fuca, Admiralty Inlet or the mouth of the Hood Canal in the Lummi U & A. The court DENIES the Lummi's motions to dismiss [docket 127–1] and for summary judgment [docket 127–2] and GRANTS the Four Tribes' cross-motion to dismiss. The

4. Citing *Narramore v. United States,* 852 F.2d 485, 490 (9th Cir.1988).

clerk of the court is hereby instructed to enter judgment in favor of the Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam and Skokomish tribes and to dismiss this subproceeding.

## STIPULATED SETTLEMENT AGREEMENT OF THE SWINOMISH INDIAN TRIBAL COMMUNITY AND THE UPPER SKAGIT INDIAN TRIBE

Subproceeding 93-1

(October 26, 1998)

■■■ This Settlement Agreement is made by and between the Upper Skagit Indian Tribe, a federally recognized Indian tribe, and the Swinomish Indian Tribal Community, a federally recognized Indian tribe organized pursuant to section 16 of the Indian Reorganization Act of 1934, on this 15th day of July, 1998.

The parties promise, represent and agree as follows:

## 1. INTRODUCTION

1.1 The undersigned Tribes are parties to the ongoing litigation in *United States v. Washington* in the United States District Court for the Western District of Washington, Civil No. 9213. This Settlement Agreement involves the Request for Determination Re: Upper Skagit Usual and Accustomed Fishing Places filed by the Upper Skagit Tribe in Subproceeding 93-1 of that litigation concerning Upper Skagit's request for expanded usual and accustomed fishing places (hereinafter "U & A places" or "U & As"). The undersigned Tribes are also parties to Subproceedings 89-3 and 97-2, which have been resolved previously, either in whole or in part, by the Interim Agreement and Stipulation between the Swinomish Indian Tribal Community and the Upper Skagit Indian Tribe dated March 29, 1994 (Subproceeding 89-

3) (hereinafter "Interim Agreement") and the Order Granting Swinomish Tribe's Motion for Preliminary Injunction dated July 29, 1997 (Subproceeding 97-2) (hereinafter "Preliminary Injunction Order").

1.2 The parties recognize that the protection of treaty fishing rights and the integrity of tribal sovereignty require maximum unity and cooperation among all affected Indian Tribes. The parties wish to avoid the waste of tribal resources, including the legal costs of a court proceeding, the additional disruption to the work currently being done by the Skagit System Cooperative (hereinafter "SSC") to which both Tribes belong, and further recognize that intertribal issues pertaining to treaty rights should be resolved by the Tribes without having to resort to court proceedings unless absolutely necessary. Finally, in the interest and spirit of cooperation, the parties wish to make certain modifications to the Interim Agreement as set forth specifically below in Section 5.

1.3 In an effort to foster closer ties between the Tribes and promote tribal unity and cooperation, this Settlement Agreement provides for the withdrawal of objections to Upper Skagit's Request for Determination Re: Usual and Accustomed Fishing Places in this subproceeding consistent with the terms set forth herein.

1.4 The parties recognize that the strict application of evidence in a court determination of Subproceeding 93-1 might support more expansive or less expansive fishing areas than agreed to herein.

1.5 This Settlement Agreement was drafted jointly by the parties, with input from both parties being received equally.

## 2. DEFINITIONS

The following definitions and standards apply to this Settlement Agreement.

2.1 AREA NUMBERS refer to Puget Sound Commercial Management and Salmon Catch Reporting Areas designated on maps adopted by the Washington Department of Fisheries in 1987 and described in the corresponding administrative regulation at WAC 220–22–030.

2.2 PRIMARY RIGHTS refer to rights which exist in certain areas which are the usual and accustomed fishing areas of more than one tribe, but where one tribe has been determined by agreement or court order to have primary control in that area ("primary tribe"), and by virtue of that status has the right to exclude all other tribes from fishing in that area. Other tribes with invitational rights ("invitee tribes") may fish in those areas only if they receive an invitation and permission from the primary tribe, and then only to the extent and on the terms set out by the primary tribe.

2.3 PARTIES refer to the Swinomish Indian Tribal Community (hereinafter "Swinomish") and the Upper Skagit Indian Tribe (hereinafter "Upper Skagit").

2.4 AREA BORDERING ON SWINOMISH RESERVATION refers to

2.4.1 the area east of a line running westerly from Kraft Island to the United States Coast Guard Sounding Board (located south of Goat Island), then northwesterly to the west end of the rock jetty (which extends southwesterly from Goat Island), then to the southwestern end of Hope Island, and then northerly to the westernmost point of Skagit Island, and then due northeasterly to the western entrance of the mouth of Turner Bay, as shown by the shaded area on the map attached hereto as Exhibit A and incorporated by reference herein; and

2.4.2 the area within WDF Area 7 south and west of a line running northwesterly from the west side of the mouth of Indian Slough to the south end of Hat Island, then to Southeast Point on Guemes Island, as shown by the shaded area on the map attached hereto as Exhibit B and incorporated by reference herein.

Nothing in the legal description of the "Area Bordering the Swinomish Reservation" shall be, or be deemed to be, an agreement between the parties as to the actual legal boundaries of the Swinomish Reservation.

2.5 THE KENNEDY LINE refers to a line drawn northeasterly from a large boulder high on the beach immediately below a beige house in the vicinity of Kennedys' Lagoon to the dock of the Rolling Hills Glencairn Community located at 1727 Penn Cove Road, as shown on the map attached as Exhibit C, and incorporated by reference herein.

2.6. THE STRAWBERRY POINT LINE refers to the line drawn from Dry Slough on Fir Island to Strawberry Point on Whidbey Island. For purposes of enforcement, the Strawberry Point Line shall be deemed to extend from Dry Slough to the United States Coast Guard lighted Red Can # 4, then to the blinking Green Light at the U.S. Coastguard sounding board near Strawberry Point, then to Strawberry Point, as shown on the map attached as Exhibit D, and incorporated by reference herein.

2.7. THE POLNELL POINT LINE refers to the line drawn from Polnell Point to Snatelum Point, both of which points are located on the east coast of Whidbey Island, as shown on the map attached as Exhibit D and incorporated by reference herein.

2.8 THE HOYPUS POINT LINE refers to the line drawn from Hoypus Point on Whidbey Island east to the western tip of Skagit Island and then due north from

the western tip of Skagit Island to the point where this line intersects Fidalgo Island at Gibraltar, as shown on the map attached as Exhibit E and incorporated by reference herein.

2.9 NORTH refers to true north, not magnetic north.

2.10 LEASED BOAT refers to any boat that does not fall within one of the following categories:

A) a boat owned and registered by an Upper Skagit tribal member that is not subject to any purchase agreement or any other loans secured to purchase the vessel (legal owner);

B) a boat owned by an Upper Skagit Tribal member, whose record of ownership is documented by the United States Coast Guard (documented owner), Provided that a courtesy copy is provided to Swinomish or filed with SSC;

C) a boat owned by an Upper Skagit tribal member but subject to repayment to a bank or other commercial lending institution, provided that the repayment agreement (note) is signed by the borrower and is approved by Upper Skagit, and provided further that a courtesy copy is provided to Swinomish or filed with SSC;

D) a boat owned by an Upper Skagit member but subject to repayment to a bona fide lender other than a bank or commercial lending institution, provided that the repayment agreement is signed by the borrower and provided further that the repayment agreement is approved by both Upper Skagit and Swinomish within forty-eight (48) hours of receipt. In computing the forty-eight hour period, Saturday, Sundays and legal holidays shall be excluded in the computation; or

E) a boat being purchased under a valid and enforceable purchase and sale contract by an Upper Skagit tribal member, provided that the contract is signed by both the purchaser and seller, and provided further that the contract has been approved by both Upper Skagit and Swinomish. The terms and conditions of the contract shall control rather than specific words, such as "sale" or "purchase." Any contract for the purchase of a boat shall be for a fixed price and shall represent the fair market value of the boat at the time of purchase, unless the seller or purchaser provides evidence of a good reason for variance from fair market value.

## 3. AGREEMENTS

3.1 Usual and Accustomed Fishing Places. The Swinomish Tribe agrees not to challenge Upper Skagit claims for usual and accustomed fishing grounds and stations as set out and disclosed in subproceeding 93–1, in exchange for Upper Skagit agreements contained in this Section herein and in Sections 4 and 5 below.

3.2 Nuwha'ha Successorship. The Swinomish Tribe acknowledges Upper Skagit successorship to Nuwha'ha for all purposes, subject to the rights reserved in a separate agreement entitled Swinomish–Upper Skagit Agreement Re Nuwha'ha, dated July 15, 1998 and incorporated by reference herein. Swinomish agrees that it shall not make any claim to Nuwha'ha successorship which it either has or might have. Swinomish and Upper Skagit agree that neither Tribe shall bring a claim for primary rights against the other based upon the treaty or other rights of the Nuwha'ha.

3.3. Skagit River. Upper Skagit agrees not to oppose, challenge or seek to limit in any way the exercise of the Swinomish Tribe's treaty fishing rights on any portion of the Skagit River, including those areas upriver from Mt. Vernon. Upper Skagit and Swinomish agree not to fish in the tributaries of the Skagit River except

by mutual agreement. Should harvest management issues arise during the exercise of treaty fishing rights on the Skagit River, Upper Skagit and Swinomish agree to meet, discuss and attempt to resolve those issues in a timely manner. If the parties are unable to resolve these issues in a timely manner, they agree to submit the matter to mediation.

3.4 South Fork Restoration. Swinomish will support the use of SSC fisheries research dollars and/or facilitate getting volunteer help to develop a finfishery in the South Fork of the Skagit River for the non-exclusive use of the Upper Skagit Tribe. For example, this effort could include clean up operations to remove snags on the South Fork.

3.5. Data Collection Study. Upper Skagit shall implement a multi-year data collection study designed by the staff of Skagit System Cooperative, or someone with comparable expertise acceptable to both parties, for the study of fisheries in the South Fork of the Skagit River and the marine waters of the South Skagit Bay Fishery, as defined below in paragraph 4.1.3 to determine harvest production capability. For the purpose of completing this study, the parties do not intend that Upper Skagit purchase a boat.

The study shall be overseen either by Upper Skagit or SSC. Whether overseen by Upper Skagit or SSC, Swinomish agrees that upon a showing of necessity, Upper Skagit may use a leased fishing boat for the data collection study, Provided that it may lease a boat for such purposes only from the following entity/tribal members and in the following order of preference: a) an Upper Skagit tribal member, b) SSC, or c) a Swinomish tribal member. If the boat is leased from either an Upper Skagit or Swinomish tribal member, Upper Skagit shall be responsible for payment for the lease and the harvest shall be

subtracted from Upper Skagit's allocation. Upper Skagit may pay the tribal member owner either by a percentage of the catch or by an amount agreed upon by the tribal member owner and Upper Skagit, but in no event will Upper Skagit be required to pay a lease amount higher than the then current reasonable rate (dollars or percentage) for a leased boat. If the boat is leased from SSC pursuant to a directive from the SSC board members, Upper Skagit shall not be responsible for the lease payment as the SSC shall absorb the costs of the lease and the harvest shall not be subtracted in full from Upper Skagit's treaty harvest allocation but rather the harvest allocation shall be treated and the proceeds shall be apportioned the same as a test fishery conducted by SSC.

3.6. Primary Rights. In the event that Swinomish files a primary rights case against any other tribe(s) in WDF Areas 6A, 7, 7A, 7B, 7C, 8 or any other area, Upper Skagit agrees not to oppose Swinomish in such a claim against another tribe; Provided that the aforementioned agreement would not apply as to a claim against the Lummi Nation; and Provided further that if Swinomish and Lummi reach agreement on primary rights in WDF Area 7A, then Upper Skagit shall support any such Swinomish/Lummi agreement. The parties further agree that Paragraphs 3(e), (f), and (g) of the Interim Agreement do not apply to primary rights claims brought against other tribes. Neither Upper Skagit nor Swinomish shall file or bring a primary rights case for any fishery including finfish, shellfish and any other aquatic species, against the other in WDF Areas 7B, 7C, 8 and the Skagit River. Based upon the agreements in this paragraph (Paragraph 3.6 of this Settlement Agreement), the parties agree that Paragraphs 3(e), (f), and (g) of the Interim Agreement are null and void.

3.7. Leased Boats. Except as set forth above in paragraph 3.5 for the purpose of conducting Tribal test fisheries, Upper Skagit and Swinomish agree not to permit leased boats in WDF Area 8. Upper Skagit agrees to follow the leased boat procedures set forth in paragraphs 2.10(A–E) above. Swinomish represents that this is the procedure which it follows with respect to leased boats. With regard to the repayment agreement referenced in subparagraph 2.10(D) above and the purchase and sale contract referenced in subparagraph 2.10(E) above, Swinomish and Upper Skagit agree not to permit any boats meeting this criteria without the approval of both parties. Should Swinomish or Upper Skagit not approve a repayment agreement referenced in subparagraph 2.10(D) above or a purchase and sale contract referenced in subparagraph 2.10(E) above, the rejection must be in writing and the reasons for the rejection set forth therein.

## 4. LIMITATIONS ON UPPER SKAGIT FINFISHING RIGHTS

4.1 U & A Places. Notwithstanding any proof of greater usual and accustomed fishing grounds and stations, Upper Skagit agrees to limit its harvest of finfish to the waters described in paragraphs 4.1.1 through 4.1.4.

4.1.1 Skagit River. The Skagit River upstream from the fork in the Skagit River where the north and south forks join (hereafter, the "Skagit Main Fork"), and the South Fork of the Skagit River downstream from the Skagit Main Fork to the commencement of WDF Area 8.

4.1.2. WDF Areas 7B and 7C. WDF areas 7B and 7C, including Padilla, Samish and Chuckanut Bays, but excluding that portion of WDF Area 7B described in 2.4.2, as shown in the shaded area on the map attached hereto as Exhibit B and incorporated by reference herein.

4.1.3. WDF Area 8–South Skagit Bay Fishery. That portion of WDF Area 8 south of the Strawberry Point Line and east of the Polnell Point Line, as shown by the shaded area on the map attached hereto as Exhibit D (hereinafter the "South Skagit Bay Fishery") and incorporated by reference herein.

4.1.4. WDF 8–Deception Pass Fishery. That portion of WDF Area 8 bounded on the west by the Deception Pass Bridge and bounded on the east by the Hoypus Point Line, as shown by the shaded area on the map attached hereto as Exhibit E (hereinafter the "Deception Pass Fishery") and incorporated by reference herein.

4.2 Withdrawn Areas. Upper Skagit agrees to withdraw any claim to and never in the future seek to establish usual and accustomed fishing grounds and stations in WDF Areas 6A, 8A and 9.

4.3 Harvest Limitations on South Skagit Bay Fishery. The following limitations shall apply to the Upper Skagit finfishery in those portions of WDF Area 8 described as the South Skagit Bay Fishery:

4.3.1. No purse seiners shall be permitted without the mutual agreement of Swinomish and Upper Skagit.

4.3.2. Except as set forth above in paragraph 3.5 for the purpose of conducting Tribal test fisheries, no leased boats shall be allowed to participate in the Upper Skagit fishery unless the owner of the boat is an Upper Skagit tribal member leasing to another Upper Skagit tribal member.

4.4. Harvest Limitations on Deception Pass Fishery. The following limitations shall apply to the Upper Skagit finfishery in that portion of WDF Area 8 described as the Deception Pass Fishery:

4.4.1. No purse seiners shall be permitted without the mutual agreement of Swinomish and Upper Skagit.

4.4.2. Except as set forth above in paragraph 3.5 for the purpose of conducting Tribal test fisheries, no leased boats shall be allowed to participate in the Upper Skagit fishery unless the owner of the boat is an Upper Skagit tribal member leasing to another Upper Skagit tribal member.

4.4.3 No more than the following number of Upper Skagit boats shall be permitted and allowed to participate in the Deception Pass Fishery at any one time. Upper Skagit shall provide the names and identification numbers of each of the boats so authorized to the Swinomish Tribe at least 24 hours prior to the opening of any fishery.

| season | boats |
| --- | --- |
| 1997–98 | 2 |
| 1998–99 | 4 |
| 1999–2000 | 6 |
| 2000–01 | 8 |
| 2001–07 | 10 |

The season/timing for each year set forth above shall commence with the Fall Chum Fishery in approximately October of each year and end with the last fishery immediately preceding the Fall Chum Fishery.

4.4.4. After the 2007 Season. Commencing with the Fall Chum Fishery in 2007, Upper Skagit and Swinomish shall revisit the boat limitations for the Deception Pass Fishery, set forth in paragraph 4.7.1 above, in the event that the Skagit wild run size for chum exceeds the base line, as calculated below, during a 12 year Skagit wild chum cycle commencing with the 12 year period from 1994–2006. Any increase in the number of permitted boats shall be determined by using this objective criteria and shall be on a pro-rata basis. The base line for the authorization of additional permitted boats in the Skagit wild chum fishery shall be determined by the average of the two highest years of the said 12–year cycle. The determination is to be made annually by preseason return forecast, but shall be adjusted by in-season adjustments. Thus, in a year in which the preseason forecast would allow additional boats, if an in-season adjustment provides data concerning the catch which is less than the determined base line, then the number of boats permitted shall be reduced to the 10 boat level. Correspondingly, if the preseason run number is less than the baseline, but an in-season adjustment exceeds the baseline, then the number of boats shall be entitled to increase beyond the 10 boat limitation. So long as the Skagit wild chum run size does not exceed the above determined base line, the maximum number of permitted boats shall remain at 10 boats.

For example, if the baseline is 100,000 chum and the predicted run size is 125,000, then Upper Skagit Tribe shall be entitled to 12 boats, i.e., 1 additional boat for each 10% increase or, in this example, 10,000 chum.

4.4.5. Harvest Management in the Deception Pass Fishery shall be based upon the preseason agreement of the Parties which shall be negotiated during the time frame of the "North of Falcon" process on a season by season basis. There shall be no overlap between the Upper Skagit and Swinomish fisheries, that is Upper Skagit will not fish on days that Swinomish fishes, except that Upper Skagit and Swinomish may fish at the same time during those days open to non-treaty. Upper Skagit shall be entitled to fish a minimum of one day per peak week during the peak week(s) of each run. Prior to each weekly opening of a Swinomish finfishery, there shall be a minimum of one day that is not fished by either tribe. If a Swinomish

finfishery reopens during a week which Swinomish has already opened, this requirement shall not apply.

In this section, "week" refers to the chum fishery management period. Under the current management regime, the week begins on Saturday and ends on Friday. If this management regime should change, the term "week" referred to in this section shall refer to the management week employed for that season.

4.5 Allocation Between the Parties

4.5.1 The parties agree to the following allocation for Skagit anadromous stocks:

| Species | Upper Skagit | Swinomish |
|---|---|---|
| Chum | 44% | 50% |
| Pink | 44% | 50% |
| Coho | 43% | 49% |
| All other species | 44% | 50% |

Allocations shall be based on the sum of the actual terminal area harvest plus the parties' estimates of the actual (as compared with a preseason prediction) preterminal harvests of the particular Skagit stock. Estimates of the actual preterminal harvests by each tribe shall be subtracted from the harvest amount allocated to that tribe pursuant to this section. For example, if the estimated terminal area harvest of Skagit Chum is 1000 fish and the estimated preterminal harvest of Skagit chum is 100 fish for the Swinomish Tribe and zero fish for the Upper Skagit Tribe, then the allocation of the terminal area harvest provided by this section would be 450 fish for Swinomish (1100 × 50% less 100) and 484 fish for Upper Skagit (1100 × 44%). Should the combined percentage of terminal area harvest of both tribes ever be increased above or reduced below the levels set forth above by court ordered allocation to another treaty tribe, the Upper Skagit and Swinomish Tribes agree to adjust and modify their respective allocation percentages on a pro-rata basis.

4.5.2 Notwithstanding the above allocations, Upper Skagit agrees to limit the harvest of its allocation in WDF Area 8 (Skagit Bay and Deception Pass fisheries) as follows:

a) Chum: The harvest of chum salmon by Upper Skagit in WDF Area 8 shall not exceed sixty percent (60%) of the Upper Skagit allocation of the terminal area chum harvest; provided however, that the maximum percentage in the first five years of the agreement shall be gradually increased over time as follows: 20% of the Upper Skagit allocation in year 1, increasing by 10% increments in each succeeding year such that the limitation on catch shall be 30% in year 2, 40% in year 3, 50% in year 4, and 60% in year 5;

b) Pinks: The harvest of pink salmon by Upper Skagit in WDF Area 8 shall not exceed sixty percent (60%) of the Upper Skagit allocation of the terminal area pink harvest; provided however, that the maximum percentage in the first five years of the agreement shall be gradually increased over time in the same manner as chum salmon;

c) Steelhead: Upper Skagit shall not conduct any steelhead fishery in WDF area 8.

d) Chinook: Upper Skagit shall not conduct any Chinook fishery in WDF Area 8 until there is a targeted Chinook fishery in WDF Area 8. At the time of a targeted fishery, the harvest of chinooks by Upper Skagit in WDF area 8 shall not exceed fifty-five percent (55%) of the Upper Skagit allocation of the terminal

area chinook harvest; provided however, that the maximum percentage allowed shall be gradually increased over time as follows: 25% of the Upper Skagit allocation during the first year a targeted chinook fishery is conducted, increasing by 10% increments in each succeeding year that there is a targeted chinook fishery, such that the limitation on catch shall be 35% during the second year a targeted chinook fishery is conducted, 45% in the third such year, and 55% in the fourth such year.

e) Sockeye: The Upper Skagit harvest of sockeye in WDF Area 8 shall be subject to negotiation between Swinomish and Upper Skagit if and when a targeted sockeye fishery should occur.

f) Coho: The Upper Skagit harvest of coho in WDF Area 8 shall be subject to negotiation between Swinomish and Upper Skagit if and when a targeted coho fishery should occur.

## 5. LIMITATIONS ON UPPER SKAGIT SHELLFISHING

5.1 Nothing in this Settlement Agreement is intended to supersede or replace the provisions of the Interim Agreement and Stipulation between the Swinomish Indian Tribal Community and the Upper Skagit Indian Tribe dated March 29,1994 or the Order Granting Swinomish Tribe's Motion for Preliminary Injunction dated July 24, 1997, except as expressly set forth below in section 5 of this Settlement Agreement.

5.2 The parties agree that each Tribe shall be entitled to harvest fifty percent (50%) of the treaty harvestable amount of shellfish on Whidbey Island beach # 240430. This fifty-fifty allocation applies to commercial (upon certification), subsistence and ceremonial harvesting unless otherwise agreed by the parties.

5.3. Upper Skagit shall be entitled to have a beach or contiguous (adjacent) beaches on Camano Island for their exclusive harvest of shellfish, that has a current productivity range of between 9,000 and 18,000 pounds per year of treaty harvestable shellfish. This beach shall be mutually agreed upon by both parties.

5.4 Upper Skagit elders and those Upper Skagit members with physical disabilities shall be entitled to harvest clams and other embedded shellfish for subsistence purposes on Beach 240150, which is certified as a Swinomish commercial area, north of a line drawn northeasterly from the "Kennedy Line", as shown by the shaded area on the map attached as Exhibit C and incorporated by reference herein. Such harvest shall be subject to the following limitations:

5.4.1. Elders shall be 55 years old or older;

5.4.2. "Subsistence" or "subsistence harvest" shall be limited to one five gallon bucket of unshucked clams or embedded shellfish per elder or disabled person per day;

5.4.3. Except where physical or mental impediments warrant, elders and physically disabled members must be present at the beach at the time of the harvest. The exception to the physical presence requirement shall not be applied to more than 3 Upper Skagit elders at any one time. Disabled members must obtain, and be able to provide when requested, written certification of their disability from their doctor. Helpers may assist by digging shellfish for elders or physically disabled members who, except as set forth above, are present at the beach.

5.4.4. Upper Skagit shall provide a courtesy copy of its disability regulation and courtesy notice when subsistence activities provided by this section occur

on Beach 240150 north of the Kennedy Line.

5.4.5. The harvest of shellfish on Beach # 240150 shall be by Upper Skagit regulation which shall contain the limitations provided by this section.

5.5. The parties agree that the term "all citizens fisheries" contained in the Interim Agreement shall mean that: Upper Skagit shall be entitled to shellfish in all areas available to the citizens of the State of Washington, including WDF area 8 north of the Snatelum Point Line, "except for the Area Bordering the Swinomish Reservation," during any state winter crab commercial fishery in WDF area 8 and any state recreational (subsistence) shellfishing on public beaches in WDF Area 8, subject to all state limitations such as opening times and harvest amounts (for clams, the current state limit is 40 clams per person per day). This provision shall be applicable to all shellfish species. Upper Skagit shall be entitled to shellfish under Upper Skagit permit and regulations, but the regulations shall be consistent with the State regulations. Upper Skagit shall not be permitted to harvest shellfish in the Area Bordering on the Swinomish Reservation identified on the map attached hereto and incorporated by reference as Exhibit A. Swinomish shall not take any action in negotiations, recommendations or agreements with the State and/or other Tribes to limit Upper Skagit harvest opportunities during an all citizens fishery.

5.6 In addition to its "all citizens" rights, Upper Skagit shall be entitled to conduct a full season crab fishery for commercial, subsistence and ceremonial purposes, in WDF 8 north of the Snatelum Point Line subject to the following limitations:

5.6.1. The total number of crab pots used in the Upper Skagit crab fishery shall not exceed 600 pots in the years 1998 and 1999; 700 pots in the years 2000 and 2001; and 750 pots in the years 2002 and beyond.

5.6.2. No more than 10 boats shall be permitted and allowed to participate at any one time in the full season (currently summer) crab fishery and no more than 100 pots shall be permitted per boat. Upper Skagit shall provide the names and identification numbers of each of the boats so authorized to the Swinomish Tribe at least 48 hours prior to the opening of any crab fishery. If in the future Swinomish shall limit its tribal members to a smaller number of pots per boat (i.e., less than 100 pots per boat), Upper Skagit tribal members shall be limited to same number of pots per boat.

5.6.3. Upper Skagit shall not be permitted to harvest crab in the "Area Bordering on the Swinomish Reservation," as shown by the shaded areas on the maps attached hereto and incorporated by reference as Exhibits A and B.

5.6.4. Each Upper Skagit crab pot buoy shall be identified by Tribal number (which currently is # 33) and the personal identification number of the Tribal member owner, and shall be uniquely colored and/or tagged so that it can be identified as an Upper Skagit crab pot and distinguished from Swinomish crab pots, which shall be marked with different colored buoys.

5.6.5. The Swinomish Tribe shall be permitted to open its crab fishery five days prior to any non-all citizens (currently summer) crab fishery opened by Upper Skagit.

5.6.6. The gear limits provided for in this agreement may be modified on a season to season basis by mutual written agreement of the parties.

5.7. No purse seiners shall be permitted in WDF Areas 8 north of the Snatelum

Point Line during an Upper Skagit crab fishery, whether conducted pursuant to Section 5.5 or 5.6 of this agreement, without the mutual agreement of Swinomish and Upper Skagit.

5.8. No leased boats shall be allowed to participate in an Upper Skagit crab fishery conducted pursuant to section 5.5 or 5.6 of this agreement, unless the owner of the boat is an Upper Skagit tribal member leasing to another Upper Skagit tribal member.

5.9 No leased pots shall be allowed to participate in the Upper Skagit crab fishery conducted pursuant to section 5.5 Or 5.6 Of this agreement, unless the owner of the pots is an Upper Skagit tribal member leasing to another Upper Skagit tribal member. Swinomish follows a similar policy of prohibiting leased pots.

## 6. PROCEDURE AND ENFORCEMENT

6.1 Regulations. Each party shall enact all necessary regulations to ensure compliance with this Stipulation.

6.2 Remedies. The parties agree that the terms of this Settlement Agreement shall be made part of a court order and that if either party fails to comply with the terms of the Settlement Agreement, the injured party may enforce this Settlement Agreement as follows:

a) Court Order. The terms of this Settlement Agreement shall be enforceable as a curt order of the United States District Court for the Western District of Washington, pursuant to and within the mechanisms established in Phase I of *United States v. Washington,* Civ. No. 9213. In the event that the continuing jurisdiction of the court in *United States v. Washington* shall be terminated, then the court retains such jurisdiction as is necessary to enforce the terms of this Settlement Agreement.

The parties agree that they may be enjoined from taking any action that fails to comply with the terms of this Settlement Agreement and may be subject to contempt and injunctive relief. Failure by Upper Skagit to substantially comply with the terms of this Settlement Agreement may result in suspension of its fishing and/or shellfishing rights in the areas identified in paragraphs 4.1.1 through 4.1.4 above.

b) Contract. If either party breaches this Settlement Agreement, the injured party, at its option, may sue for specific performance of the Settlement Agreement, or sue for breach of contract which shall be limited to a suit for damages and injunctive relief, or any combination of the above. The contract remedies shall include only those remedies specifically set out in this Settlement Agreement and shall not include avoidance of the contract or the discharge of any duties or self-help by either party.

c) No Court Modification. No modification of this Settlement Agreement shall be made by order of any court unless agreed to in writing by each of the parties.

d) Dispute Resolution. The parties agree that in the event that a dispute arises from this Stipulation that cannot be resolved by mutual agreement, the parties shall submit the issues to federal court for determination.

## ORDER

The above Stipulation, including the separate agreement entitled Swinomish–Upper Skagit Agreement Re Nuwha'ha dated July 15, 1998 incorporated by reference herein, is hereby approved and made an Order of the Court. The parties are ordered to fully comply with all of the terms thereof.

Exhibit A

Exh. A

Exhibit B

Exhibit B

Exhibit C

Exhibit D

Exhibit E

## ORDER DENYING STATE OF WASHINGTON'S MOTION FOR SUMMARY JUDGMENT AND GRANTING QUINAULT NATION'S CROSS–MOTION FOR SUMMARY JUDGMENT

Subproceeding No. 83–3

Entered on Docket Dec. 03, 1998

THIS MATTER comes before the court on the State of Washington's motion for summary judgment on the fish counting issue and the Quinault Indian Nation's cross-motion for summary judgment on this issue. The court has reviewed the documents filed in support of and in opposition to the motions together with the relevant files. Being fully advised, the court denies the State's motion for summary judgment and grants judgment in favor of the Quinault.

## I. BACKGROUND

The State of Washington seeks a determination of how the catch taken by members of the Confederated Tribes of the Chehalis Indian Reservation from the Chehalis River should be counted. The Chehalis River is a tributary of Grays Harbor. The Chehalis Indian Reservation is on the Chehalis River and Chehalis tribal members fish on the reservation. In an earlier proceeding in this case, this court determined that the Chehalis did not have a right to fish off-reservation. The Ninth Circuit Court of Appeals affirmed this ruling. *Confederated Tribes of Chehalis Indian Reservation and Shoalwater Bay Indian Tribe v. State of Washington,* 96 F.3d 334 (1996), *cert. denied,* 520 U.S. 1168, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997).

Two tribes fish in Grays Harbor, the Chehalis and the Quinault. Earlier in this

proceeding, the State asked the court to make a determination as to how the catches of members of the two tribes fishing the Chehalis and Grays Harbor area should be allocated under *United States v. Washington*. The court deferred ruling on this issue until the Chehalis' claim to off-reservation fishing rights could be resolved. The State now moves for summary judgment on this issue, arguing that the Chehalis' catch should be allocated against the 50% Indian treaty share in the catch from that area.

The Confederated Tribes of the Chehalis Indian Reservation are not signatories to the Stevens Treaties. Thus, they do not claim treaty fishing rights. Their fishing rights flow from, and are limited to, their ownership rights to the Chehalis Indian Reservation, which was established in 1864 pursuant to an executive order. The Quinault Indian Nation is a treaty tribe. It is the only treaty tribe that fishes in the Grays Harbor area and counting the Chehalis' catch against the 50% tribal treaty share would necessarily impact its harvest allocation.

The Quinault cross-moves for summary judgment. It contends that the Chehalis catch cannot be counted against the tribal treaty share because the Chehalis Tribe is not a treaty tribe. It argues the Chehalis catch should be allocated to the non-treaty harvest share. Alternatively, it argues that 50% of the Chehalis catch should be allocated to the tribal treaty harvest share and 50% should be allocated to the non-treaty harvest share.[1] The Chehalis argue the court should count its tribal fishery as one-third of the total harvest, count the state's fishery as one-third, and allocate the remaining third to the Quinault.

The Tulalip Tribe has filed a response to the cross-motions for summary judgment. Although it does not have an interest in the Grays Harbor harvest, it notes that the court's ruling in this case will have an impact in other cases involving the allocation of the fishing rights of non-treaty tribes. It urges the court to count the Chehalis' catch in the non-treaty fish share. It contends that counting the catch of a non-treaty tribe against treaty tribes' harvest allocations reduces the value of the treaty rights of the treaty tribes. The United States joins the State's position on this issue.

## II. DISCUSSION

### A. Counting issue

■ The State argues that although the Chehalis Tribe is not a treaty tribe, its federal right to fish, which is incidental to its ownership of a tribal reservation, is analogous to the right of treaty tribes to take fish at their usual and accustomed grounds and stations. It contends, therefore, that the Chehalis' catch is properly allocated to the treaty tribe share. The State argues that for purposes of equitable allocation of fisheries, the rights of treaty tribes and non-treaty tribes should be treated the same. It contends, therefore, that the catch should be allocated between a tribal share and a non-tribal share (as opposed to a treaty and non-treaty share). In essence it is arguing that for the purpose of allocating fisheries, all federally-recognized Indian tribes should be treated the same, regardless of whether they have a treaty with the United States.

None of the cases relied on by the State, however, stand for the proposition that the allocation of rights of various tribes are

---

1. This is the allocation the parties have been operating under pursuant to Judge Coyle's earlier order. He ordered this allocation as an interim measure while the Chehalis' off-reservation rights were being resolved.

indistinguishable regardless of their status as a treaty tribe or that their harvest allocation should be simply lumped together because they enjoy federally protected fishing rights. On the contrary, the principle of the equitable allocation is a treaty obligation, required by the signatories' agreement to share the fisheries "in common." See *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (*Fishing Vessel*). The equitable allocation of fisheries simply cannot be divorced from its source: the treaties between the United States and certain Indian tribes.

The State's position is also at odds with the express prohibition against counting the off-reservation catch of non-treaty Indians against the treaty tribes' share set forth in *United States v. Washington:*

> The defendants shall not, with respect to any [non-treaty] Indian tribe treat any off-reservation taking of fish from stocks of the case area by such tribe or group as treaty fishing in making any allocation of fish to treaty Indians or in restricting the fishing of tribes recognized by this court as treaty tribes ... without first obtaining the concurrence of the tribes involved.

459 F.Supp. 1020, 1037 (1978). The State contends that this provision does not make any distinction between federally protected fishing rights secured by treaty and federal protected Indian fishing rights secured

by "other means." It argues that this provision only distinguishes between groups with federally protected fishing rights and groups without federally protected fishing rights. The court disagrees. The provision clearly and explicitly refers to treaty Indians and non-treaty Indians and mandates that the off-reservation harvest of the latter cannot be counted against the treaty tribes' allocation.[2] It is only logical to extend this reasoning to on-reservation non-treaty Indians.

The cases the State relies on to not compel a different result. It argues that under *Fishing Vessel*,[3] fishing shares should be divided into tribal and non-tribal shares (as opposed to treaty and non-treaty shares) for purposes of equitable allocation. The question in *Fishing Vessel*, however, "concern[ed] the character of [the] *treaty right to take fish*"[4] and the allocation of the share of fish between the parties to the various treaties. Nothing in that opinion makes the distinction the State urges, nor does it support the State's speculation that the *Fishing Vessel* court would have held that the Chehalis Tribe's catch is part of a tribal share had it been confronted with this issue.

Similarly, the State's reliance on *Parravano v. Babbitt*[5] is unavailing. In that case, the court determined that, for the purposes of evaluating the Secretary of Commerce's authority to reduce the harvest of non-Indian fishers in order to protect the on-reservation fisheries of two In-

---

**2.** The provision refers only to non-treaty tribes' off-reservation taking of fish, not on-reservation taking, which is involved here. At the time, on-reservation catch did not count against treaty tribes' 50% harvest share. *See United States v. Washington*, 384 F.Supp. 312, 343 (W.D.Wash.1974) ("Since tribal on-reservation treaty right fishing is exclusive, fish taken on reservation shall not be included in any allocation of fish between treaty and non-treaty fishermen."). Thus, the reference only

to off-reservation taking does not change the court's analysis.

**3.** 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823.

**4.** *Id.* at 662, 99 S.Ct. 3055 (emphasis added).

**5.** 70 F.3d 539 (9th Cir.1995), *cert. denied* 518 U.S. 1016, 116 S.Ct. 2546, 135 L.Ed.2d 1066 (1996).

dian tribes, the fact that the tribes' fishing rights derived from executive orders rather than treaties was immaterial. The plaintiffs in *Parravano* argued that an executive order could not be considered "any other applicable law" under the Magnuson Act, which the Secretary had relied on. The court held that, with respect to non-federal interests, there are no broad distinctions between Indian reservations created by treaty and those created by executive order.

The *Parravano* court held that nature of tribal *on reservation* fishing and hunting rights do not depend on whether the rights derived from a treaty or an executive order. That is not at issue here. The State is arguing that any catch taken by the Chehalis, (which by virtue of the fact that it is not a treaty tribe, is restricted to on-reservation fishing), should be counted against the catch of a treaty tribe fishing in the same area. *Parravano* simply does not address whether the catch of a non-treaty tribe, which has no right to fish off-reservation but also no treaty obligation to share its on-reservation fishery,[6] should be allocated in the treaty share of the catch or the non-treaty share of the catch.

 The court concludes that only fish caught by treaty tribal members may be counted against the treaty harvest allocation. The Quinault Nation, therefore, is entitled to summary judgment on this issue.

## B. Continuing jurisdiction

The Chehalis Tribe, which is not a party to *United States v. Washington*, contends the court should retain jurisdiction over this subproceeding because issues may arise in the future concerning the Chehalis

watershed catch. The court agrees that it may be necessary to resolve future disputes between these parties and that retaining jurisdiction is proper.

## III. CONCLUSION

The court DENIES the State of Washington's motion for summary judgment [docket 482–1] and GRANTS the Quinault Indian Nation's cross-motion for summary judgment [docket 493–1]. The court rules that any salmon or steelhead harvested by members of the Chehalis Tribe shall be allocated to the non-treaty harvest share. The court retains continuing jurisdiction over this proceeding. The Clerk of the Court is directed to terminate this subproceeding for statistical purposes only.

## STIPULATION OF THE UPPER SKAGIT TRIBE AND THE TULALIP TRIBES CONCERNING UPPER SKAGIT TRIBE'S USUAL AND ACCUSTOMED FISHING PLACES

Subproceeding Nos. 89–3 and 93–1

(January 29, 1999)

This agreement is made by and between the Upper Skagit Tribe and The Tulalip Tribes, both federally recognized Indian tribes, on the date noted above the signatures.

The parties promise, represent and agree as follows:

1. Introduction. The undersigned tribes are parties to the ongoing litigation in *United States v. Washington* in the United States District Court for the Western District of Washington, Cause No. 9213 and in all subproceedings thereof, including Subproceeding No. 89–3 dealing

---

**6.** *See State v. Stritmatter,* 102 Wash.2d 516, 688 P.2d 499 (1984) (noting that the Chehalis tribe has not granted away any of its exclusive fishing rights because the executive order forming the Chehalis Reservation does not have the "in common" language of the treaties entered into by other Western Washington tribes).

with shellfish entitlement and Subproceeding No. 93–1 dealing with Upper Skagit usual and accustomed fishing places. This settlement agreement involves the Request for Determination Re Upper Skagit Usual and Accustomed Fishing Places filed by the Upper Skagit Tribe (Subproceeding No. 93–1). On or about September 19, 1997, representatives of the Tulalip Tribes and the Upper Skagit Tribe reached agreement concerning scope of Upper Skagit tribal fishing in certain areas. The essential contents of that agreement are contained in this stipulation, which is intended to carry it into effect.

The parties recognize that the protection of treaty fishing rights and the integrity of tribal sovereignty require maximum unity and cooperation among all affected Indian tribes. The parties wish to avoid the waste of tribal resources, including the legal costs of a long, drawn out court proceeding, and further recognize that intertribal issues pertaining to treaty rights should be resolved by the tribes without having to resort to court proceedings unless absolutely necessary.

In an effort to foster closer ties between the tribes and promote tribal unity and cooperation, The Tulalip Tribes agree to withdraw objections to the Upper Skagit Tribe's Request for Determination Re: Usual and Accustomed Fishing Places (Subproceeding No. 93–1, as well as objections to the Upper Skagit request for shellfish usual and accustomed places in Subproceeding No. 89–3), as to all areas dealt with in this agreement, consistent with the terms set out herein.

The parties recognize that the strict application of evidence in a court determination of this matter might support more expansive or less expansive fishing areas than agreed to herein.

## 2. SHELLFISH AREAS

2.1 Shellfish Areas. The Upper Skagit Tribe agrees to forgo shellfishing and agrees never in the future to seek to exercise shellfish fishing rights in the following Washington Department of Fisheries Salmon Catch Reporting Areas: those portions of Saratoga Passage, Holmes Harbor, and Possession Sound in Areas 8 and 8A lying southerly and easterly of a line from Lowell Point southwesterly to the small boat ramp located off of North Bluff Road in the town of Greenbank, just south of Pratt's Bluff as depicted on Map A, attached hereto and incorporated herein by reference.

2.2 Joint Use Areas. In the remainder of WDF Area 8, it is agreed that such areas are joint use areas. Each tribe may use such areas without permission of the other. For areas used together, the tribes agree to co-operate and coordinate use.

2.3 Area 8 Joint Enhancement for Shellfish. It is agreed that the parties will jointly investigate suitable habitat on (a) the east side of Whidbey Island from Rodena Beach to the small boat ramp identified in ¶ 2.1, *supra,* and (b) the west side of Camano Island from approximately Sunset Beach to Lowell Point, for possible enhancement for the joint benefit of the parties.

## 3. SALMON AREAS

3.1 Withdrawal of Salmon Fishing Areas. The Upper Skagit Tribe agrees to forego fishing, and agrees never in the future to seek to establish usual and accustomed salmon fishing areas in the following Washington Department of Fisheries Salmon Catch Reporting Areas: those portions of Saratoga Passage, Holmes Harbor, and Possession Sound in Areas 8 and 8A lying southerly and easterly of a line from Camano City due west to the eastern shore of Whidbey

Island as depicted on Map B, attached hereto and incorporated herein by reference, including all rivers and streams (including their tributaries and the bed and banks thereof), which drain into those areas, and will not attempt to exercise salmon fishing rights in any of those areas.

3.2 Joint Use Areas. In the remainder of WDF Area 8, it is agreed that such areas are joint use areas.

4. General Provisions.

4.1 Primary Rights Claims. The Upper Skagit Indian Tribe agrees not to make a primary rights claim in either subproceeding. The Upper Skagit Indian Tribe agrees to not oppose the Tulalip Tribes' claims to primary rights in state fishing area 8A.

4.2 Presentation of Claims and Evidence; Proposed Findings and Conclusions. With respect to the presentation of claims and evidence in Subproceeding No. 89–3, and in reliance on this agreement, The Tulalip Tribes agreed and did not oppose the Upper Skagit Indian Tribe's claims which were limited to the scope described herein. The Tulalip Tribes refrained from examination and cross-examination in trial in Subproceeding No. 89–3 of all tribal expert or lay witness whose testimony involved matters described herein. The Tulalip Tribes did not propose nor join in any proposed finding of fact or conclusion of law that would establish or preclude the establishment of any claim whose assertion would be in conflict with the terms of this stipulation.

4.3 No Modification of Existing Usual and Accustomed or Primary Rights. Notwithstanding anything in this stipulation to the contrary, nothing herein shall be construed to modify or limit the rights of any tribe as to its previously determined usual and accustomed grounds and stations, or as to its previously determined primary or exclusive rights in such areas.

4.4 Status Quo of Formal and Informal Agreements Between Tribes Maintained. Subject to the provisions of this agreement and orders of the court defining usual and accustomed fishing grounds and stations ("U & A places") and primary rights, it is the intent of the parties thereto, except as specifically set forth herein, to maintain the presently existing status quo established by formal and informal agreement(s) between and among tribes as it relates to U & A places. Absent agreement to the contrary, a tribe shall not be precluded from shell fishing in one of their U & A places solely because there has been no directed tribal salmon fishery in that area during previous seasons. For example, the absence of directed tribal salmon fisheries in WDF salmon catch reporting Area 9 during the past four years shall not preclude any tribe otherwise entitled to fish in that area from shell fishing there.

4.5 Existing Rights Preserved: Stipulation Not An Admission. Notwithstanding anything in this stipulation to the contrary, neither tribe waives any of its rights under paragraph 25 of the Court's March 22, 1974, Injunction in *United States v. Washington*, 384 F.Supp. 312, 419 (W.D.Wash.1974), as later modified by the court's order. Nor does either tribe by agreeing to this stipulation admit any fact or concede any legal theory.

5. Regulations. Each party shall enact all necessary regulations to ensure compliance with this agreement.

6. Stay of Agreement. In the event that either tribe is barred from fishing in any of the areas described in this stipulation by litigation or agreement or other

operation of law, then the portion of this stipulation relating to fishing in that area is stayed, pending further agreement of the parties or court order.

7. Remedies. The parties agree that the terms of this agreement shall be made part of a court order and that if either party fails to comply with the terms of the agreement, the injured party may enforce this agreement as follows:

a. Court Order. The terms of this agreement shall be enforceable as a court order of the United States District Court for the Western District of Washington, pursuant to and within the mechanisms established in Phase I of *United States v. Washington,* Civil No. 9213. In the event that the continuing jurisdiction of the court in *United States v. Washington* shall be terminated, then the parties agree that the court retains such jurisdiction as is necessary to enforce the terms of this agreement,

b. Injunctive Relief. The parties agree that they may be enjoined from taking any action that fails to comply with the terms of this agreement and may be subject to contempt and injunctive relief.

c. Contract. If either party breaches this agreement, the injured party, at its option, may sue for specific performance of the agreement, or sue for breach of contract which shall be limited to a suit for damages and injunctive relief, or any combination of the above. The contract remedies shall include only those remedies specifically set out in this agreement and shall not include avoidance of the contract or the discharge of any duties or self-help by either party.

d. For the purposes of enforcement of this paragraph, each tribe or party hereto hereby waives sovereign immunity and agrees to suit, for the purpose of enforcing this agreement only, in the federal District Court for the Western District of Washington.

8. No Court Modification. No modification of this agreement shall be made by order of any court unless agreed to in writing by each of the parties.

9. Dispute Resolution. The parties agree that in the event that a dispute arises from this agreement that cannot be resolved by mutual agreement, the parties shall submit the issues to federal court for determination.

10. Agreement Concerning Court Order in Subproceeding # 93–1. The parties agree to jointly present a court order adopting this agreement to the court in this subproceeding. The parties agree that any order adopted by the court concerning the underlying issues in this proceeding must be consistent with this agreement and neither party will seek nor advocate any order inconsistent with this agreement. Each party agrees to oppose the entry of any order not consistent with this agreement.

## ORDER APPROVING STIPULATED SETTLEMENT BETWEEN LUMMI NATION AND UPPER SKAGIT INDIAN TRIBE

### Subproceeding 93–1

### February 16, 1999

■ **THIS MATTER** comes before the Court on the joint motion of the Lummi Nation and the Upper Skagit Indian Tribe to approve the Settlement Agreements between these two Tribes. Upon consideration of the records and files herein, IT IS HEREBY;

**ORDERED:**

1. The Court has jurisdiction over the subject matter of this subproceeding.

2. The Court has examined the Stipulations between the Lummi Nation and the Upper Skagit Indian Tribe filed with this Court on or about January 21, 1999, and dated March 7, 1994 and May 13, 1997.

3. No responses, objections, or replies to the settlement have been filed. No party has filed a pleading objecting on any substantive grounds to the approval of the Agreement.

4. Both Stipulations are hereby adopted as Court Orders and incorporated herein as if fully set out. This Order is binding on the signatories to the Agreement and shall be enforceable by them in the same manner and in the same respect as any other Order in this subproceeding or in *United States v. Washington.* In the event that in the continuing jurisdiction of the Court in *United States v. Washington,* is terminated, then this Court retains such jurisdiction as is necessary to enforce the terms of the Agreement.

5. This is a final Order in this subproceeding and the subproceeding is hereby deemed complete as between the Lummi Nation and the Upper Skagit Indian Tribe.

## STIPULATION BETWEEN THE LUMMI NATION AND THE UPPER SKAGIT INDIAN TRIBE

### Subproceeding Nos. 89–3 and 93–1

#### (March 7, 1994)

COME NOW the undersigned parties, by and through their attorneys, and hereby enter into this Stipulation for the purposes and considerations set forth herein:

1) The Upper Skagit Indian Tribe has made claims in Subproceeding 89–3 to establish usual and accustomed fishing areas for shellfish in the lands, waters, subtidal land, bedlands and tidelands adjacent and subjacent to the marine areas and fresh water areas as set forth on the map attached hereto and made a part hereof as Exhibit A.

2) The Upper Skagit Indian Tribe has made claims in Subproceeding 93–1 to establish marine and fresh water usual and accustomed fishing areas for finfish in the areas set forth on the map attached hereto and made a part hereof as Exhibit B.

3) The Upper Skagit Indian Tribe has made a claim to being a successor in interest to the Nuwha'ha, a signatory to the Point Elliot Treaty.

3) The Lummi Nation agrees not to challenge the Upper Skagit claims set forth above in paragraphs 1, 2, and 3 above in the listed subproceedings or in any other subproceeding so long as said claims are limited in scope to those disclosed and set forth above.

4) The Upper Skagit Tribe and the Lummi Nation agree that neither Tribe shall assert or make a primary rights claim against the other Tribe in the areas set forth above in paragraphs 1 and 2 for shellfish, fin fish, anadromous, nonanadromous, or any other marine or aquatic species within the said areas set forth above.

5) The Upper Skagit Indian Tribe agrees that with respect to shellfishing and fishing regulations for the areas set forth above, the Upper Skagit shall provide advance notice in writing to the Lummi Nation and an opportunity to consult concerning any tribal fishery opening.

6) The Upper Skagit and the Lummi Nation agree to cooperate in shellfish enhancement in the areas set forth above in Exhibit A.

7) In the event that the Lummi Nation shall seek primary rights in WDF 7A, the Upper Skagit Tribe shall support such request, unless a primary rights agreement can be reached on WDF 7A between the Swinomish Tribe and the Lummi Nation, then the Upper Skagit Tribe shall support said Swinomish / Lummi agreement.

8) In the event that the Lummi Nation shall seek primary rights in WDF 7, so

long as that assertion is not inconsistent with the position taken by the Swinomish Tribe, then the Upper Skagit Tribe shall support such request.

9) This Stipulation may be filed with the Court at any time and the Upper Skagit Indian Tribe and the Lummi Nation hereby agree to a limited waiver of sovereign immunity for the purposes of enforcing this Stipulation.

10) This Stipulation represents the entire agreement between the parties and shall not be amended or modified except in writing signed by the parties hereto and / or their authorized attorneys.

STIPULATION BETWEEN THE LUMMI NATION AND THE UPPER SKAGIT INDIAN TRIBE

EXHIBIT A

STIPULATION BETWEEN THE
LUMMI NATION AND THE
UPPER SKAGIT INDIAN TRIBE

EXHIBIT B

## ORDER APPROVING STIPULATED SETTLEMENT BETWEEN SWINOMISH AND UPPER SKAGIT TRIBES

### Subproceeding 93–1

### (February 16, 1999)

This matter comes before the Court upon the motion of the Swinomish Indian Tribal Community and the Upper Skagit Indian Tribe to approve the Stipulated Settlement Agreement executed on July 15, 1998, by these same Tribes. Upon consideration of the files and records herein, it is hereby ordered as follows:

1. The Court has jurisdiction over the subject matter of this subproceeding.

2. The Court has examined the "Stipulated Settlement Agreement of the Swinomish Indian Tribal Community and the Upper Skagit Indian Tribe" ("Agreement"), filed with the Court on October 22, 1998. The Court approved the Agreement on October 26, 1998.

3. On October 27, 1998, the Tulalip Tribes ("Tulalip") filed an objection and sought a two week period in which to review the Agreement.

4. Upon receipt of Tulalip's objection, the Court entered a minute order advising the parties that it construed Tulalip's objection as a motion for reconsideration and set a schedule for responses and replies.

5. The Swinomish Indian Tribal Community responded on November 11, 1998. No other responses or replies have been filed. No party has filed a pleading substantively objecting to the approval of the Agreement.

6. The Agreement is hereby adopted as a Court order and incorporated herein. This Order is binding on the signatories to the Agreement and shall be enforceable by them in the same manner and same respect as any other district court order in this case. In the event that the continuing jurisdiction of the Court in *United States v. Washington* shall be terminated, then the Court retains such jurisdiction as is necessary to enforce the terms of the Agreement.

7. This is a final order in this subproceeding and this subproceeding is hereby deemed complete between the Swinomish Indian Tribal Community and the Upper Skagit Indian Tribe.

ORDER APPROVING STIPULATION OF THE UPPER SKAGIT TRIBE AND THE TULALIP TRIBES CONCERNING UPPER SKAGIT TRIBE'S USUAL AND ACCUSTOMED FISHING PLACES

Subproceeding Nos. 89–3 and 93–1

(February 16, 1999)

■■■ This matter comes before the court upon motion of The Tulalip Tribes. Upon consideration of all relevant materials, it is hereby ordered as follows:

1. The court has jurisdiction over the subject matter of this subproceeding.

2. The court has examined the "Order Approving Stipulation of the Upper Skagit Tribe and The Tulalip Tribes Concerning Upper Skagit Tribe's Usual and Accustomed Fishing Places," filed with the court on January 28, 1999. The court finds that the Stipulation represents a fair and equitable settlement of the disputes between the Upper Skagit Tribe and The Tulalip Tribes in this subproceeding.

3. All parties to this case were given notice of the Stipulation and all comments, if any, have been incorporated herein. The Stipulation is hereby adopted as a court order and incorporated herein. This Order is binding on the signatories to the Stipulation and shall be enforceable by them in the same manner and same respect as any other district court order in this case. In the event that the continuing jurisdiction of the court in *United States v. Washington* shall be terminated, then the court retains such jurisdiction as is necessary to enforce the terms of the Stipulation.

4. This is a final order in this subproceeding and this subproceeding is hereby deemed complete.

ORDER GRANTING PETITIONER'S MOTION FOR SUMMARY JUDGMENT, DENYING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING SUBPROCEEDING

Subproceeding 97–1

(September 10, 1999)

THIS MATTER comes before the court on the respondent Muckleshoot Tribe's motion for summary judgment and the petitioner Swinomish, Suquamish and Puyallup tribes' ("Three Tribes") cross-motion for summary judgment. The parties seek a ruling on the extent of the Muckleshoot's saltwater fishing rights in Puget Sound. The court has considered the pleadings filed in support of and in opposition to the motions and heard oral argument. Being fully advised, the court grants the Three Tribes' motion for summary judgment, denies the Muckleshoot's

motion for summary judgment and dismisses this subproceeding.

## I. BACKGROUND

### A. Factual Background

The Three Tribes brought this subproceeding asking this court to determine the extent of the Muckleshoot's usual and accustomed (U & A) fishing places under Judge Boldt's Finding of Fact (FOF) 76. Judge Bolt found that the Muckleshoot's ancestors had the following U & A:

> Prior to and during treaty times the Indian ancestors of the present day Muckleshoot Indians had usual and accustomed fishing places primarily at locations on the upper Puyallup, the Carbon, Stuck, White, Green, Cedar and Black Rivers, the tributaries to these rivers (including Soos Creek, Burns Creek and Newaukum Creek) and Lake Washington, and secondarily in the saltwater of Puget Sound.

*United States v. State of Washington*, 384 F.Supp. 312, 367 (W.D.Wash.1974). The Muckleshoot's freshwater fisheries are not in dispute. What is in dispute is whether Judge Boldt intended to designate a saltwater fishery for the Muckleshoot and, if so, what areas he intended "secondarily in the saltwater of Puget Sound" to encompass. The Three Tribes argue that the Muckleshoot's saltwater treaty fishing places under FOF 76 are limited to Elliott Bay (Department of Fisheries Area 10A). They seek a declaratory judgment that the Muckleshoot's U & A does not include waters within Areas 10, 11 or waters west and north of Area 10 and an injunction preventing the Muckleshoot from fishing those areas. The Muckleshoot argue that the term "Puget Sound" cannot be interpreted to limit its fishing area to Elliott Bay and that Judge Boldt intended the phrase "Puget Sound" to include the inside marine waters from Admiralty Inlet to the Tacoma Narrows § Areas 9, 10, 10A and 11). The Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam and Skokomish Tribes (referred to collectively as "Jamestown S'Klallam") have filed a response in opposition to the Muckleshoot's motion for summary judgment. The Jamestown S'Klallam propose a third interpretation of FOF 76. They contend that by referring to the Muckleshoot's saltwater fisheries as "secondary," Judge Boldt intended to indicate that those fishing rights were permissive fishing rights in relation to resident primary tribes. They argue that the Muckleshoot's saltwater fishing should be confined to the eastern shores of Puget Sound south of the northern border of Area 10.

### B. Procedural background

A brief summary of the court's earlier rulings is helpful to understanding the present posture of this controversy. The Three Tribes filed an earlier motion for summary judgment and the Muckleshoot filed a cross motion to dismiss. The Three Tribes also previously filed a motion to strike portions of the Muckleshoot's brief in opposition to their summary judgment motion and two documents in support of that brief: Dr. Barbara Lane's 1998 affidavit and a 1993 shellfish report by Dr. Lane and Lynn Larson. While those motions were pending, the Ninth Circuit Court of Appeals issued an opinion in *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (1998). This court asked the parties to file supplemental briefing to address what, if any, impact the Ninth Circuit's opinion had on the pending motions.

After the parties filed supplemental briefing, this court issued an order granting the Muckleshoot's motion to dismiss in part and granting the Three Tribes' motion to strike in part. In their motion to dismiss, the Muckleshoot had argued with

respect to Areas 9, 10 and 11 that the Three Tribes' claim should be dismissed for lack of ambiguity. With respect to areas beyond 9, 10, and 11, the Muckleshoot argued that the claim should be dismissed because the court does not have a continuing jurisdiction over it. The following is a summary of the court's order on those motions:

### 1. Ambiguity

The Three Tribes contended that the term "Puget Sound" is ambiguous in light of the record. And they argued that Judge Boldt's reference to a primary and secondary dichotomy (in the phrase "secondarily in the saltwater of Puget Sound") renders FOF 76 inherently ambiguous. The court found that FOF 76 is ambiguous because it is susceptible to more than one interpretation. In addition, the court found that Judge Boldt's use of the term "secondarily" to describe the Muckleshoot's U & A in Puget Sound is ambiguous.

### 2. Evidence admissible to resolve an ambiguity

After finding that the phrases "Puget Sound" and "secondarily" are ambiguous, the court addressed what evidence would be admissible to resolve the ambiguity. The Three Tribes contended that the Ninth Circuit's *Muckleshoot* opinion foreclosed consideration of evidence that was not in the record before Judge Boldt. They argued that the opinion allows extra-record evidence only if the record does not contain any evidence clarifying the issue before the court and the ambiguity, therefore, cannot be resolved from the record. The Three Tribes argued that the ambiguity in this case can be resolved by reference to the record alone.

At issue in *Muckleshoot* was what Judge Boldt meant in precise geographic terms by his use of the phrase "the present environs of Seattle." The Ninth Circuit held that this court "correctly determined that 'the key to resolving the controversy lies in determining what Judge Boldt meant in precise geographic terms by his use of the phrase "the present environs of Seattle."'" 141 F.3d at 1358. It held, however, that this court erred in concluding that Judge Boldt's intended meaning could be determined by reference to what Dr. Lane later testified she intended the phrase to mean in her reports to Judge Boldt. The Ninth Circuit held that Dr. Lane's latter-day testimony is extraneous to the decree and the underlying record and that its admission was in error. It observed, however, that on remand "[i]t will be up to the parties to offer admissible evidence to enable the district court to interpret the decree in specific geographic terms. While evidence that was before Judge Boldt when he made his finding is obviously relevant, there may be other evidence indicative of the contemporary understanding of 'the present environs of Seattle.'" 141 F.3d at 1359 (emphasis added).

This court ruled that since the Ninth Circuit explicitly stated that this court can consider evidence besides evidence before Judge Boldt when he made his finding, this court is not foreclosed from considering extra-record evidence. It is, however, foreclosed from imputing someone else's understanding of a phrase to Judge Boldt. The court further observed that while the evidence before Judge Boldt is unquestionably the most relevant and persuasive in determining his intention, the court does not need to make a separate inquiry to determine if it can go outside the record in the first place.

The court granted in part the Three Tribes' motion to strike portions of the Muckleshoot's brief, appendix and affidavit

of Barbara Lane. The court ruled it would consider extra-record evidence as long as it is relevant to determining Judge Boldt's intention.

### 3. Continuing jurisdiction (Areas beyond 9, 10, 11)

In *Muckleshoot*, the Lummi were currently taking fish in the disputed area. The Ninth Circuit remanded with instructions to proceed under subparagraph 25(a) of the injunction in *United States v. Washington* because the court was presented with a controversy over whether a party's actions were in conformity with the injunction. 384 F.Supp. at 419. In previous pleadings, the Muckleshoot represented that they have no present intention of fishing in areas beyond Areas 9, 10, and 11. They argued that this court could not make a decision under subparagraph (a) about whether their actions in areas beyond Areas 9, 10, and 11, are "in conformity with" the injunction because they are not currently fishing in those areas nor do have they have a present stated intention to fish in those areas. This court agreed, finding that since the Muckleshoot do not intend to fish in those areas, the petitioners' claim does not require a determination as to whether "actions, intended or effected by any party" are in conformity with the permanent injunction with respect to those areas. This court concluded that, pursuant to the Ninth Circuit's opinion in *Muckleshoot*, it did not have jurisdiction under subparagraph (a) to resolve the petitioners' claims with respect to Areas outside 9, 10, and 11. The court, therefore, granted the Muckleshoot's motion to dismiss with respect to areas beyond Areas 9, 10, and 11. Accordingly, those areas are not at issue in these cross motions.

## II. DISCUSSION

The following facts are undisputed: At treaty time, the Muckleshoot's predecessors were upriver Indians with fisheries primarily in the Duwamish and upper Puyallup drainage systems. The Muckleshoot lived on the Duwamish and upper Puyallup drainage systems; they did not live directly on the bays and lower reaches of the rivers. There is evidence in the record before Judge Boldt that the Muckleshoot descended the rivers to fish in Elliott Bay and used the beaches of Puget Sound to gather shellfish supplies. At issue is what, if any, Muckleshoot saltwater U & A Judge Boldt intended to designate in FOF 76.

The Muckleshoot argue that by using the phrase "Puget Sound" without limitation, Judge Boldt intended to include at least the area from Admiralty Inlet (Area 9) to the Tacoma Narrows (Area 11). The Three Tribes contend there is no evidence in the record that the Muckleshoot ever fished in saltwater beyond Elliott Bay; and, thus, there is no evidence in the record from which to infer that Judge Boldt intended to designate a Muckleshoot fishery beyond Elliott Bay. The Jamestown S'Klallam argue that the Muckleshoot saltwater U & A should be confined to the shoreline, because there is no evidence in the record that they fished in the open water. Specifically, the Jamestown S'Klallam argue that the Muckleshoot fishery is limited to the eastern shores of Puget Sound south of the northern border of Area 10. They further argue that by using the term "secondarily," Judge Boldt intended to designate only a permissive fishery, i.e. one only allowed when permitted by the resident primary tribes of the area.

■ The parties agree that the Muckleshoot have at least some fishing rights in Elliott Bay (Area 10A). What they do not agree on is what is the extent of those rights, more particularly: 1) whether the Muckleshoot have saltwater fishing rights that extend beyond Elliott Bay; 2) if their saltwater fishing rights are constrained by

the phrase "secondarily" and 3) if their saltwater fishing rights are limited to the shoreline, or whether they include fishing on the open water.

## A. Evidence relied on by Judge Boldt

As the court noted in its previous order, although it may consider evidence that was not before Judge Boldt, obviously the evidence most relevant in determining what Judge Boldt intended by the phrase "secondarily in the saltwater of Puget Sound" is the record evidence to which he cited. Thus, the court's starting point in this inquiry is a review of that evidence before Judge Boldt to determine whether it resolves the ambiguity in the phrase at issue. In FOF 76, Judge Boldt cited to four items: 1) the parties' final pretrial order; 2) the Summary Anthropological Report of Barbara Lane; 3) Anthropological Report on the Traditional Fisheries of the Muckleshoot Indians by Barbara Lane; and 4) the Report from Carroll Riley, Anthropologist.

### 1. Final pretrial order

The text of this section is almost identical to that of FOF 76 and is, therefore, unhelpful in determining Judge Boldt's intent. PTO at § 3–53 [docket 353].

### 2. Summary Anthropological Report of Barbara Lane

The text of the relevant section of Dr. Lane's summary states:

> The principal fisheries of the ancestors of the Muckleshoot both prior to and during treaty times included Green River, White River, Stuck River, Cedar River, and tributary creeks.

USA 20 at 38.

### 3. Anthropological Report on the Traditional Fisheries of the Muckleshoot Indians by Barbara Lane

The relevant portion of this report states:

> The traditional fisheries of the Muckleshoot included but were not limited to Puyallup and Carbon rivers and tributary creeks; the Stuck, White, Green and Cedar rivers and tributary creeks; and Lake Washington. In addition, there was some trolling for salmon in salt water when families descended the rivers to get shell fish supplies on the beaches of the Sound.

USA 27b at p. 7.

### 4. Report from Carroll Riley

Riley's report concurs with Lane's report regarding the traditional fishing areas of the Muckleshoot predecessor tribes. Relevant to the issue here, Riley's report states at page 12:

> According to informants, the Indians in this area obtained the greatest part of their subsistence from fish caught in the White and Green Rivers, although some hunted sporadically (especially the villagers from S'bae'quabsh [a predecessor tribe]) in the foothills of the Cascades. *They occasionally made the trip downriver to Elliott Bay on fishing and clamming expeditions.*

PL–23 at 12 (emphasis added).

## B. Evidence relied on by the Muckleshoot

In addition to the evidence cited to by Judge Boldt, the Muckleshoot rely on the following documents: 1) Exhibits G–17(a) and G–17(e)—Indian Claims Commission (ICC) Findings of Fact for Duwamish Tribe and Puyallup Tribe, respectively; 2) Exhibit G–27—"The Puyallup–Nisqually" by Marion Smith; 3) Exhibit PL–73–a map overlay that was used in Judge Boldt's courtroom in *United States v. Washington;* and 4) the declaration of Richard L. Mor-

rill.[1] For the reasons discussed below, the court does not find these items helpful or persuasive in resolving the issue before it.

### 1. ICC Findings of Fact

The Muckleshoot rely on the Puyallup proceeding before the ICC. In its findings for that proceeding, the ICC noted that the evidence before it tended to show joint use by the Puyallup and other tribes, including the Muckleshoot, of certain areas in the Puget Sound, "including those areas lying on the islands in southern Puget Sound." G–17(e) at 12. The Muckleshoot also rely on the Duwamish proceeding for the proposition that the ICC confirmed a joint use on the shoreline of Puget Sound by limiting the Duwamish territorial claim. G–17(a) at 5–131.

The court finds that the ICC documents are not helpful to determining Judge Boldt's intent. Judge Boldt himself determined that these documents should be given very little weight in determining U & As because the focus of ICC proceedings was entirely different:

> Proceedings before the ... Indian Claims Commission ... dealt with compensation claims for tribal lands taken by the United States, and in no way dealt with asserted Indian treaty fishing rights. Certain historical and anthropological evidence presented for consideration ... in this case, which evidence was not rebutted by the defendant State of Washington, was not available to the Indian Claims Commission.

*United States v. Washington,* 459 F.Supp. 1020, 1042 (W.D.Wash.1978). Furthermore, the ICC document in the Duwamish proceeding does not make any reference to other tribes besides the Duwamish and the court finds that it does not support the Muckleshoot's argument at all.

### 2. "The Puyallup–Nisqually" by Marion Smith

In his book, Smith wrote that large groups from several up-river bands in the Puget Sound area undertook expeditions for shellfish "regularly in summer." Ex. G–27 at 26. "They followed the drainage systems only in a very broad sense and the grounds used simultaneously by family groups from different villages were those which are usually called 'lands in common.' " Id. He also notes that these bands used eight regions for joint summer expeditions including: Rodondo Beach, Vashon Island, Colvos Passage, Fox Island, Anderson Island, the Mouth of the Nisqually, Squaxin Island and the East side of Harstine Island. Although Smith refers to upriver bands, he does not refer to the Muckleshoot specifically in this excerpt. The court, therefore, finds this excerpt unhelpful it determining Judge Boldt's intent.

### 3. Map overlay

The Muckleshoot make an argument based on an overlay to the map that was in Judge Boldt's courtroom showing areas in the Puget Sound designated to other tribes. They argue that by elimination, an area on the overlay north the Puyallup and south of the Lummi U & A "was probably perceived by Judge Boldt to represent Muckleshoot fishing places." This area includes Elliott Bay, Shilshole Bay, Port Madison, and waters of Puget Sound between Seattle and Bainbridge Island. There is no evidence, however, to support their contention that areas that did not specifically fall within other tribes' Puget Sound U & As on the map, by elimination, fell within a predecessor tribe's U & A. Thus, the court does not consider exhibit PL–73 indicative of Judge Boldt's intent.

1. Morrill's declaration is extra-record evidence.

### 5. Morrill Declaration

 Morrill is a geography professor. His opinion is that the most restrictive use of "Puget Sound" is understood to encompass the marine waters from Admiralty Inlet south. The Muckleshoot have submitted three marine charts showing the location of Puget Sound described by cartographers, which corresponds to Morrill's opinion. The Muckleshoot have moved the court to take judicial notice of the charts, which is opposed by the Three Tribes. Contrary to what the Muckleshoot argue, this court can only take judicial notice of facts not in dispute. It cannot take judicial notice of charts or maps where the geographical facts at issue are in dispute. *See Muckleshoot,* 141 F.3d at 1358 n. 4. Thus, the court declines to take judicial notice of the charts.

The court, furthermore, is unpersuaded that Morrill's opinion on the contemporary meaning of "Puget Sound" is helpful in resolving this motion. This court's task is to determine the U & A Judge Boldt intended to designate in FOF 76. Although it is Morrill's opinion that a contemporary speaker would have intended "Puget Sound" to refer to the areas described above, in the context of this case, the court finds it is obvious Judge Boldt did not intend to designate such a vast area as the Muckleshoot U & A. The court could only conclude that Judge Boldt used "Puget Sound" in FOF 76 in the manner described by Morrill by grossly contorting the evidence and the history of this case.

In light of the other U & As Judge Boldt delineated, it is inconceivable to the court that he would intend to give the Muckleshoot, an upriver people, a vast saltwater U & A stretching from the Tacoma Narrows to Admiralty Inlet and overlapping the U & As of tribes with a documented history of open water fishing in the same areas. The evidence in the record is that the Muckleshoot's predecessors were upriver Indians with fisheries primarily in the freshwater of the Duwamish drainage who descended to fish at the river's mouth in Elliott Bay. There is no evidence that the Muckleshoot fished in the open marine waters beyond Elliott Bay. Furthermore, there is no evidence that the Muckleshoot possessed the technology to fish on the open waters of Puget Sound. There is, for example, no evidence that the Muckleshoot ever used anything other than the shovelnose river canoe which was unsuitable for extended open water fishing. According to Marion Smith, inland peoples "made and used only [the] shovel-nose type [canoe] ... [which] was used only on rivers above the tide flats." Ex. 33 at 289.[2] Thus, the court is persuaded that Judge Boldt could not have intended the Muckleshoot's U & A to include the open waters of Puget Sound as Professor Morrill uses that term.

### C. Muckleshoot saltwater U & A

#### 1. Boundaries

It is clear from the documents Judge Boldt specifically cited to that the predecessors of the Muckleshoot were a primarily upriver people who may have, from time to time, descended to Elliott Bay to fish and collect shellfish there. The court finds that the evidence before Judge Boldt establishes, at a minimum, that the Muckleshoot's predecessors may have occasionally fished in the open waters of Elliott Bay near the mouth of the Duwamish and gathered shellfish on the shores of Elliott Bay. Based on this evidence, the court con-

---

**2.** Ex. 33 is the subject of the Muckleshoot's motion to strike evidence. The objection is not well taken considering the Muckleshoot also rely on parts of Smith's book in support of their summary judgment motion.

cludes that Judge Boldt intended to include those areas (Department of Fisheries Area 10A) in the Muckleshoot U & A. In light of the evidence before Judge Boldt that the Muckleshoot did fish in the open waters of Elliott Bay,[3] the court rejects the Jamestown S'Klallam's argument that the Muckleshoot U & A should be limited to the shoreline.

The court finds, however, that there is no evidence in the record before Judge Boldt, nor is it persuaded by extra-record evidence, that Judge Boldt intended to describe a saltwater U & A any larger than the open waters and shores of Elliott Bay, The court agrees with the Muckleshoot that Judge Boldt's use of a broad term like "Puget Sound" is perplexing in light of the geographic precision he generally used in describing U & As. And it agrees that, as a resident of the Puget Sound area, it is fair to assume that he would not have used the terms "Elliott Bay" and "Puget Sound" interchangeably. However, there is no evidence in the record before Judge Boldt that supports a U & A beyond Elliott Bay. In the court's view, Judge Boldt probably did not use a great deal of precision in describing the Muckleshoot's saltwater U & A since the saltwater U & A was clearly not the main focus of FOF 76 and was only of secondary importance in relation to the Muckleshoot's river U & As, which are described in great detail in FOF 76.

### 2. Primary/secondary distinction

As noted above, the Jamestown S'Klallam argue that by using the term "secondarily" Judge Boldt intended to designate only a permissive fishery, i.e. one only allowed when permitted by the resident primary tribes of the area. The court rejects this argument because the court finds nothing in the evidence before Judge Boldt or in his opinion in *United States v. Washington* that supports this interpretation. Furthermore, it is illogical to assume that Judge Boldt would have included an area in a finding of fact designating a "usual and accustomed" fishing ground if he only meant to indicate that the area was a permissive fishing ground. In other words, if a fishing area was really only permissive, by definition it would not be a usual and accustomed fishing ground. Finally, had Judge Boldt intended to designate merely a permissive fishing ground, he would have used the term "permissive" instead of "secondarily" as he did in FOF 12.[4] The court concludes that, in light of the evidence before him, Judge Boldt intended to use "secondarily" in an ordinary, or common sense manner to indicate that the saltwater U & A was of minor or lesser importance. He did not, the court concludes, intend to restrict the U & A through this observation.

### CONCLUSION

The court grants the Three Tribes' motion for summary judgment [docket 119–1], denies the Muckleshoot's motion for summary judgment [docket 114–1], denies the Muckleshoot's motion to strike [125–1] and dismisses this subproceeding. The court finds that respondent's U & A is limited to Department of Fisheries Area 10A and hereby enjoins respondent from fishing in

---

3. The court refers specifically to the reports of Barbara Lane, USA 27b, and Carroll Riley, PL–23, both of which refer to fishing and/or trolling expeditions as well as shellfish gathering.

4. FOF 12 explains "... Generally, individual Indians had primary use rights in the territory where the resided and permissive use rights in the natal territory (if this was different) or in the territories where they had consanguineal kin." *United States v. Washington,* 384 F.Supp. at 353.

Department of Fisheries Area 9, 10, and 11.

## ORDER ALTERING AND AMENDING JUDGMENT

### Subproceeding 97–1

### October 18,1999

THIS MATTER comes before the court on the Muckleshoot Tribe's Motion to Alter or Amend the court's September 9, 1999 order and September 16, 1999 judgment. The court GRANTS this motion, and hereby deletes the following text from its order of September 9, 1999:

Furthermore, it is illogical to assume that Judge Boldt would have included an area in a finding of fact designating a "usual and accustomed" fishing ground if he only meant to indicate that the area was a permissive fishing ground. In other words, if a fishing area was really only permissive, by definition it would not be a usual and accustomed fishing ground.

### Subproceeding No. 97–1

### October 21, 1999

MINUTE ENTRY: IN CHAMBERS PROCEEDINGS:

The court's October 18, 1999, order altering judgment is hereby amended to substitute the word "Tulalip" for the word "Muckleshoot."

## ORDER GRANTING MUCKLESHOOT TRIBE'S MOTION FOR SUMMARY JUDGMENT

### Subproceeding 99–1

### (November 4, 1999)

THIS MATTER comes before the court on the Muckleshoot Tribe's (hereinafter Muckleshoot) Motion for Summary Judgment. Muckleshoot seeks a judgment that defines the southern boundary of the Lummi Nation's (hereinafter Lummi) usual and accustomed fishing places (hereinafter U & A). Muckleshoot contends that Lummi's U & A, whatever may be its northern terminus, has a southern border somewhere north of Washington Department of Fisheries Commercial Salmon Management and Catch Reporting Area 10 (hereinafter Area 10). Muckleshoot does not seek a more precise ruling from this court.

The court has reviewed the documents filed in support of and in opposition to the motion together with the relevant files Being fully advised, the court finds that Lummi's U & A does not include any portion of Area 10 and, therefore, grants Muckleshoot's motion for summary judgment.

## I. BACKGROUND

In 1974 Judge Boldt issued a sweeping opinion analyzing fishing rights secured by treaty with nearly all of Washington's Indian tribes. That opinion laid out in great detail, based on historical patterns and practices, the areas in which each tribe retained the right to take fish. As with any work of this magnitude, Judge Boldt's opinion left areas that needed interpretation.

This matter is one of the many subproceedings under the original case, undertaken to clarify an element of the Boldt decision. In 1995, this court held that Lummi's U & A did not extend into Area 10 and Muckleshoot was awarded partial summary judgment. Lummi appealed from that ruling to the Ninth Circuit, which remanded the case for further interpretation of the Boldt opinion.

The question presented by Muckleshoot's current motion is how to construe Judge Boldt's Finding of Fact 46, which both parties agree fixes the Lummi's usual & accustomed fishing area. Specifically, in order to rule on this motion, the court

must decide what Judge Boldt meant to encompass when he referred to "the marine areas of northern Puget Sound from the Fraser River south to the present day environs of Seattle."[1]

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the court must view all facts and inferences therefrom in the light most favorable to the non-moving party. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

### B. Interpreting Judge Boldt's Decision

 The most important piece of data identifying the Lummi's U & A is Judge Boldt's Finding of Fact (FOF) 46. FOF 46 provides:

> In addition to the reef net locations listed above, the usual and accustomed fishing places of the Lummi Indians at treaty times included the marine areas of Northern Puget Sound from the Fraser River south to the present environs of

Seattle, and particularly Bellingham Bay.

The only issue raised by this motion is what meaning Judge Boldt intended by use of the phrase "Northern Puget Sound from the Fraser River south to the present environs of Seattle."

#### 1. "Northern Puget Sound"

Judge Boldt found that Lummi's U & A falls generally within Northern Puget Sound. The parties are in significant, if not intractable, disagreement over the phrase "northern Puget Sound," and it does appear that the phrase was used often and variously enough by the Judge that assigning precise meaning is a ponderous challenge.[2] The question becomes whether the inability to give a precise definition to "northern Puget Sound" creates a genuine issue of material fact. The issue before the court is the southern boundary of the Lummi's U & A. Since the court finds that there is a precise point at which to draw that boundary, any dispute as to the meaning of "northern Puget Sound" is not material.

#### 2. "Present environs of Seattle"

Whatever northern Puget Sound represented to Judge Boldt, it is clear that he bounded Lummi's U & A on the south at the "present environs of Seattle." *See also* 141 F.3d at 1360. The parties vehe-

---

**1.** The Muckleshoot Tribe emphasizes that it is not asking the court to fix any boundary other than the southern boundary of the Lummi Nation's U & A. The Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam and Skokomish Tribes have joined Muckleshoot as interested parties, and likewise request that the court avoid resolving any factual questions other than that presented. The parties reason that any determination by this court unnecessary to resolving the instant question may prejudice one or more of the Tribes' interest in other fishing areas, and spur additional litigation. In order to avoid such an outcome, the court shall answer only the limited question presented, and leave any attendant ambiguity unresolved for the present time.

**2.** Moreover, in light of the parties' desire that the court confine its decision to the narrowest grounds possible, it is prudent to avoid unnecessarily pronouncing the meaning of the disputed phrase. To do so may inspire the parties and other interested tribes to revisit every appearance of the term in Judge Boldt's writings (and there are many) and relitigate its significance in other contexts.

mently disagree as to what the term means.

Muckleshoot argues that the 1974 environs of Seattle stretched so far north as to include the City of Edmonds. As a result, Muckleshoot argues, Lummi's USA cannot include waters south of Edmonds and, by extension, cannot include any portion of Area 10. In support of this argument, Muckleshoot submits the declarations of Dr. Morrill, a University of Washington Geography professor with extensive practical experience assessing the location and definition of municipal areas, and evaluating population as it effects the boundaries of metropolitan and urbanized areas. The court had previously stricken Dr. Morrill's first declaration because "it supplement[ed] the record rather than assisting the court in determining Judge Boldt's intent at the time of decision." Muckleshoot continues to rely on the first declaration of Dr. Morrill. Muckleshoot also submits the second declaration of Dr. Morrill after the Ninth Circuit indicated that the parties may present "other evidence indicative of the contemporary understanding of 'the present environs of Seattle.'"

In response, Lummi argues that Dr. Morrill's opinions "are irrelevant since there is no evidence that Judge Boldt heard these opinions, consulted the references used by Dr. Morrill, or in any way approached the definition of 'environs of Seattle' in the way proposed by Dr. Morrill." Lummi Nation Reply Memorandum at 10. Lummi does not otherwise attack Dr. Morrill's credentials nor his methodology. Lummi's relevance argument is not well-founded.

In its ruling on the appeal in this case, the Ninth Circuit has essentially determined that courts are no longer to make any new determinations regarding U & As. *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir.1998). The task is simply to interpret past findings. *Id.* at 1359. Nevertheless, in order to resolve ambiguous language such as that involved here, the Ninth Circuit instructed that the court may examine additional "evidence indicative of the contemporary understanding of 'the present environs of Seattle.'" *Id.* at 1360.

Lummi overlooks the significance of the language of the Ninth Circuit's remand of this case. While it is true that the parties cannot submit additional evidence locating U & As, they can submit additional evidence that sheds light on Judge Boldt's intent and the contemporary meaning of his chosen phrases. It is for this sole purpose that this court relies on both Dr. Morrill's first and second declarations and the supporting evidence.

The court finds Dr. Morrill's analysis persuasive. Dr. Morrill's declaration marshals powerful evidence that Edmonds was part of the Seattle environs as of the date of Judge Boldt's decision. Dr. Morrill discusses labor shed data from the 1970 Bureau of Census study indicating that the Seattle metropolitan area included all of King and Snohomish Counties. This finding is augmented by other census data regarding population densities, indicating that "the Seattle Urbanized Area extended from the King County/Pierce County line on the south to the Snohomish River on the North." First Declaration of Dr. Morrill at 4. That evidence places the "environs of Seattle" at the time of Judge Boldt's decision well north of Area 10.

Lummi's burden, therefore, was to introduce evidence regarding the "contemporary environs of Seattle" that controverts Muckleshoot's position. That they have not done. Nor have they indicated a basis on which to reject Dr. Morrill's expertise. As a result, because the court is satisfied with Dr. Morrill's identification of the northern reaches of the environs of Seattle

at the time of Judge Boldt's decision, Muckleshoot is entitled to summary judgment declaring that Lummi's U & A does not include any portion of Area 10.

### III. CONCLUSION

Judge Boldt limited Lummi's U & A to that area north of the present environs of Seattle. The court finds that the Seattle environs included Edmonds at the time of Judge Boldt's decision, As a result, Muckleshoot's motion for summary judgment [docket 18–1] is hereby granted.

### ORDER GRANTING MOTION TO ALTER OR AMEND JUDGMENT

Subproceeding 99–1

(December 9, 1999)

THE COURT hereby GRANTS the parties' motions to alter or amend judgment. The court's Order Granting Muckleshoot Tribe's Motion for Summary Judgment entered on November 4, 1999, is hereby amended as follows:

The first two sentences of the paragraph at page 6, lines 9–18 are hereby stricken. The remainder of the paragraph is revised to read as follows:

In its ruling on the appeal in this case, the Ninth Circuit determined that this court's task is simply to interpret its past findings with respect to the Lummi's previously determined U & A. *Muckleshoot Tribe v. Lummi Indian Tribe,* 141 F.3d 1355 (9th Cir.1998). Nevertheless, in order to resolve ambiguous language such as that involved here, the Ninth Circuit instructed that the court may examine additional "evidence indicative of the contemporary understanding of the 'present environs of Seattle.'" *Id.* at 1360.

The court's second paragraph is revised to read as follows

Lummi overlooks the significance of the language of the Ninth Circuit's remand of this case. While it is true that the parties cannot submit additional evidence locating U & As in this subproceeding, they can submit additional evidence that sheds light on Judge Boldt's intent and the contemporary meaning of his chosen phrases. It is for this sole purpose that this court relies on both Dr. Morrill's first and second declarations and the supporting evidence.

### ORDER CLARIFYING IMPLEMENTATION ORDER RE TRIBAL ACCESS ACROSS PRIVATE UPLAND PROPERTY

Subproceeding No. 89–3

(December 11, 1999)

EDWARD RAFEEDIE, Senior District Judge.

The Court has read and considered the papers filed in connection with Intervenor-defendants Alexander, Adkins and United Property Owners of Washington, et al. (hereinafter "Private Property Owners") Motion For Clarification of Implementation Order Re: Tribal Access Across Private Upland Property, and deeming the matter fit for resolution without the need for oral argument, now reaches the following CONCLUSIONS:

■ The Private Property Owners request that the Court "clarify" section 7.2.4 of its Treaty Implementation Order to mean that the "absence of access by boat, public road, or public right of way" refers to the absence of *any* tribal access by such means, not "merely the absence of *reasonable* access by those means." Motion for Clarification, at 1:22–23 (emphasis in original). The Court finds that this proposed

construction is improper for two reasons. First, the Court intended section 7.2.4 of its Treaty Implementation Order to imply a "reasonable access" requirement. The Court directed that a Special Master be appointed to adjudicate disputes under the Implementation Order, and it was the Court's intent that the Special Master would make factual inquiries in disputed cases in order to determine whether reasonable access existed. In the event it did not, the Court intended that the Tribes be granted access across the privately owned upland properties in order to reach the shellfishing areas.

■ Second, the Court finds that the Private Land Owner's proposed interpretation of section 7.2.4 is not in accord with applicable law because "[t]he Supreme Court has already determined that the Tribes are entitled to a right of access across private lands to invoke their Treaty fishing rights." *United States, et al. v. State of Washington, et al.,* 135 F.3d 618, 641–42 (9th Cir.1998), *citing United States v. Winans,* 198 U.S. 371, 383, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). To hold that access over private land would only be permitted in the event that *no* other access exists would be to require heroic measures by the Tribes to enforce their all of their Treaty rights. That was not the original intent of this Court in designing its Implementation Order, and, in the Court's view, is not a permissible limitation of the Tribes' Treaty rights under *Winans. See, e.g.,* 198 U.S. at 381, 25 S.Ct. 662.

■ The Court does, however, agree with the Private Land Owners that clarification of the Implementation Order is mandated by the Ninth Circuit's decision in this case. See 135 F.3d at 642, n. 16. Therefore, in keeping with the Court's original intent in devising the Implementation Order, the Court ORDERS that section 7.2.4 of the Implementation Order be amended to reflect that the Special Master should refuse access across privately owned upland property unless "tribal members can demonstrate the *reasonable* absence of access by boat, public road, or public right of way." (Emphasis added on new language). In defining the contours of "reasonable access", the Court is guided by *Winans,* which held that the Treaties at issue in this litigation "imposed a servitude upon every piece of land as though described therein." 198 U.S. at 381, 25 S.Ct. 662. Numerous Washington state cases have interpreted "reasonable access" in the context of servitudes, and the Court believes that these cases provide a satisfactory framework for determining whether access is "reasonable" or not.

■ [4] Therefore, it is ORDERED that the Special Master should determine the "reasonableness" of access in disputed cases under section 7.2.4 by evaluating the following three factors. First, the economic burden to the Tribes of accessing a shellfishing area by either boat, public road, or public right of way. *See, e.g., Evich v. Kovacevich,* 33 Wash.2d 151, 158–59, 204 P.2d 839 (1949) (reasonableness inquiry focusing on whether alternative means of access would have required "disproportionate expense"); *Rogers v. Cation,* 9 Wash.2d 369, 378, 115 P.2d 702 (1941) (focusing on whether alternate access could be achieved at "reasonable cost"). Second, the amount of time and effort that the Tribes would be required to expend to gain access by boat, public road, or public right of way. *See generally Wreggitt v. Porterfield,* 36 Wash.2d 638, 640, 219 P.2d 589 (1950) (evaluating whether more than "reasonable trouble" was required to gain alternative access). Third, whether requiring the Tribes to access a particular shellfishing area by boat, public road, or public right of way would impose a significant risk of physical danger upon them.

The Court notes that all three factors need not be present in order for the Special Master to afford the Tribes access over private property. Any of the factors can suffice, either alone or in combination, to show that access is not "reasonable" for purposes of this Court's Implementation Order if it is first shown to be a substantial impediment to Tribal access. Further, if exceptional circumstances warrant, the Special Master may consider factors not specified by the Court to determine whether access is "reasonable" or not.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail or by telefax, copies of this Order on counsel for the parties in this matter.

**UNITED STATES of America, et al., Plaintiffs,**